1
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
2
Richmond Division

3

ALFREDO R. PRIETO                    }
4                                    }
v.                                   }     Civil Action No.
5                                    }     3:15 CV 587
HAROLD W. CLARKE, EDDIE              }
6 PEARSON, DAVID ZOOK, and           }
OTHER UNKNOWN EXECUTIONERS,          }
7 EMPLOYEES, AND AGENTS              }
                                           October 1, 2015
8

9           **COMPLETE TRANSCRIPT OF MOTIONS**
          **BEFORE THE HONORABLE HENRY E. HUDSON**
10          **UNITED STATES DISTRICT COURT JUDGE**

11

12 APPEARANCES:

13 Elizabeth J. Peiffer, Esquire
Robert E. Lee, Jr., Esquire
14 VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
2421 Ivy Road, Suite 301
15 Charlottesville, Virginia  22903

16      Counsel on behalf of Alfredo R. Prieto

17

Margaret H. O'Shea, Esquire
18 Richard C. Vorhis, Esquire
OFFICE OF THE ATTORNEY GENERAL
19 (Richmond)
900 East Main Street
20 Richmond, Virginia  23219

21      Counsel on behalf of the Defendants

22

23

24           KRISTA L. HARDING, RMR
             OFFICIAL COURT REPORTER
25        UNITED STATES DISTRICT COURT

| | E X A M I N A T I O N S | | | |
| --- | --- | --- | --- | --- |
| | DIRECT | CROSS | REDIRECT | RECROSS |
| Dr. James Ruble | 20 | 50 | 55 | -- |
| Arnold Robinson | 62 | 75 | 78 | -- |
| Carlos Hernandez | 79 | 85 | -- | -- |

```
 1              (The proceeding commenced at 1:01 p.m.)

 2        THE COURT:  Good afternoon.

 3        All right, Ms. Pizzini, call our next case, please.

 4        THE CLERK:  Number 15 CV 587.  Alfredo R. Prieto v.

 5   Harold W. Clark, et al.

 6        The plaintiff is represented by Ms. Elizabeth Peiffer

 7   and Mr. Robert Lee, Jr.

 8        The defendants are represented by Ms. Margaret O'Shea

 9   and Mr. Richard Vorhis.

10        Are counsel ready to proceed?

11        MS. O'SHEA:  Yes, Your Honor.

12        MS. PEIFFER:  We are, Your Honor.

13        THE COURT:  This matter is before the Court this

14   afternoon on an emergency petition seeking preliminary

15   injunctive relief, essentially seeking to enjoin the

16   execution protocol contemplated by the Commonwealth of

17   Virginia in this case.  It is based upon an alleged Eighth

18   Amendment violation, and it is to be reviewed on an as

19   applied basis, as I read the petition.

20        On that preface, I will go ahead and hear any opening

21   statements you may have.  I will take any evidence you

22   would choose to present, then I'll hear closing arguments,

23   and I will issue an opinion this afternoon, all right?

24   Very well.

25        Ms. Peiffer.
```

1      MS. PEIFFER:  Good afternoon, Judge.

2      THE COURT:  Good afternoon, ma'am.

3      MS. PEIFFER:  We are here today, and we have

4 requested that the defendants be enjoined from executing

5 Mr. Prieto this evening at 9:00 at Greensville

6 Correctional Center, using a compounded substance

7 purported to be pentobarbital, until the Virginia

8 Department of Corrections can provide evidence

9 establishing that the exercised due diligence in

10 acquiring, and analyzing, the information needed to assess

11 risk.

12      We ask the Court that they allow the temporary

13 restraining order granted yesterday by Judge Trenga to

14 remain in effect, and allow discovery, and an opportunity,

15 to ensure that the execution of Mr. Prieto would not

16 violate the Eighth Amendment.

17      We do not seek to interfere with the Commonwealth's

18 ability to execute someone in a manner consistent with the

19 Constitution.  That is not why we are here today.  We are

20 here to discuss the specifics, and this recently obtained

21 information that the Commonwealth will be using a

22 substance purported to be pentobarbital obtained from the

23 Texas Department of Criminal Justice at the end of August.

24      We think that there's a likelihood of success on the

25 merits that there is a substantial risk of harm because

1   the Department of Corrections has recklessly planned to

2   use a drug without investigation, and that there will be a

3   substantial risk that Mr. Prieto will not be unconscious

4   or insensate for the administration of the second two

5   drugs of the lethal injection protocol.  As Your Honor is

6   familiar with, the second two drugs of the lethal

7   injection protocol are rocuronium bromide and potassium

8   chloride.

9        In *Baze v. Rees*, the United States Supreme Court

10  found that if a person were not unconscious and unfeeling

11  by the time the second two drugs were administered, that

12  there would be a substantial, constitutionally

13  unacceptable risk of suffocation from the administration

14  of the rocuronium bromide and pain from the injection of

15  the potassium chloride.

16       It's for this reason that in Virginia, especially,

17  using this 3-drug protocol, the first drug, this purported

18  pentobarbital that has been compounded in this unknown

19  pharmacy, is so significant.  If the first drug does not

20  work, the lethal injection protocol in Virginia will be

21  unconstitutional.

22       We have come here today with evidence, and we've

23  presented in our pleadings, some of the reasons and

24  allegations that we think that there's a problem with

25  using this substance purported to be pentobarbital.  And

1    the issue is that the defendants didn't investigate.   And

2    we're not saying that it would be impossible to use

3    pentobarbital --

4         THE COURT:  Now, they contend in their pleading, and

5    I know the evidence will either bear this out or refute

6    it, that the Texas Department of Corrections performed an

7    independent test, and provided a copy of that

8    certification to the Virginia Department of Corrections.

9    Will their evidence not show that, Ms. Peiffer?

10        MS. PEIFFER:  That is correct.  We received yesterday

11   afternoon the first -- for the first time, evidence that

12   they performed some testing on April 24, 2015, before the

13   drugs were transferred to Virginia.

14        Based on the Department of Corrections' pleadings,

15   the drugs were transferred in August of 2015.  And if

16   you'd like, I can speak to the laboratory report for a

17   moment that we just received yesterday.

18        THE COURT:  Well, I'll hear your final argument after

19   hearing all the evidence.  But when you say that they took

20   no efforts whatsoever to verify the effectiveness of the

21   drug, I just merely had to see whether or not my

22   understanding was correct that in fact they did have an

23   independent examination by a laboratory in Texas.

24        MS. PEIFFER:  I'm sorry.  You are correct, Your

25   Honor.  There was an examination for the reasons that we

1 have presented in our pleading.

2     THE COURT:  And they found it to be 94.9% pure,

3 right?

4     MS. PEIFFER:  On April of 2015, it was 94.6% pure.

5     THE COURT:  Okay.

6     MS. PEIFFER:  I think there are two issues with the

7 testing.  And we can present expert testimony on this

8 matter.

9     THE COURT:  Okay.

10     MS. PEIFFER:  First, is that you will notice from the

11 lab report presented as Exhibit 1, that the only testing

12 that they seem to have done was potency testing.  The

13 sterility testing, which is at the top of the report, is

14 all left blank.  There are three sterility tests that were

15 not performed.  And this is atypical.

16     Sterility is a big issue in compounded drugs.  In

17 addition, sterility is needed to give a drug, a high-risk

18 sterile injectable, such as pentobarbital.  Sterility

19 testing is required if it's going to have a beyond use

20 date beyond three days.  Three days is the accepted beyond

21 use date if the substance, a high-risk injectable, is

22 refrigerated.  If there is not sterility testing, three

23 days is the beyond use date.

24     In this case, based on the photographs we received,

25 the beyond use date is one year, which indicates that

1    either the Virginia Department of Corrections did not

2    obtain and investigate this testing, that they still have

3    not produced all of the testing, or that they don't

4    understand what is significant in determining whether

5    pentobarbital, or the substance purported to be

6    pentobarbital, would be effective.

7           And that's really one of the issues with compounded

8    drugs, and one of the distinctions we think that is

9    important to make.  Compounded pentobarbital, or the

10   substance purported to be compounded pentobarbital, is

11   very distinct from pentobarbital that is manufactured as a

12   pharmaceutical.  Pharmaceuticals are regulated by the

13   F.D.A., and there are very strict regulations about

14   quality control.

15          Compounded substances are not regulated by the F.D.A.

16   They're mixed up in small batches, they are mixed up in

17   independent pharmacies, and the batch variability

18   completely determines how the drug will work.  So one

19   batch mixed up in a pharmacy of 24 vials could have one

20   set of qualifications and potency and sterility, a batch

21   mixed in the same pharmacy the next day could have

22   completely different characteristics because of the way

23   compounded drugs work.  So I think it's important to

24   recognize this distinction.

25          THE COURT:  Ms. Peiffer, no Court has ever held that

1   a person in the situation of your client is entitled to

2   optimum sterility or optimum compounding or preparation of

3   the drug.  Only to a drug that doesn't create severe pain.

4       MS. PEIFFER:  That's correct.  And what we are

5   alleging is that use of this drug would create a

6   substantial risk of serious pain.

7       THE COURT:  Okay.  All right.

8       MS. PEIFFER:  There are a number of issues like I

9   just discussed with the sterility, and reasons to believe

10  that the drug might not be good.  There are also issues

11  with the potency.  As you remarked, the potency in April,

12  which was almost six months ago, approximately five to six

13  months ago, was 94.6%.  The range of potency that is

14  acceptable for this drug is 92% to 108%.  And potency

15  declines with time.

16      So this drug was manufactured -- I'm sorry.  It was

17  not manufactured.  It's a compounded substance.  It was

18  mixed.  There's a difference.

19      It was mixed almost six months ago.  And potency

20  degrades with time, which means that changes the way the

21  drug works.  Now, we don't know what the potency is today.

22  We can allege, and we believe, that there is reason to

23  think that it would have declined since that point.

24      Another factor that's very important to consider in

25  this particular case is that the conditions that these

1  fragile mixtures are kept in are very significant, and can

2  substantially change the way that the drug works.  So

3  transporting the drug from Texas to Virginia could well

4  have changed the potency of the drug.  And from the

5  information that we have received, which we believe to be

6  the only information that exists, no potency testing has

7  been done since the drug was manufactured in April in

8  Texas and moved to Virginia.

9       And so those are just some of the risks that we think

10 that the Department has taken, and some of the issues that

11 they do not seem to understand about why, in Virginia

12 particularly, this compounded substance could indeed

13 create a substantial risk of serious harm to Mr. Prieto.

14      I think another important thing to note is that

15 Virginia is fairly unique among the states that's been

16 using this compounded pentobarbital, or something -- other

17 batches of compounded pentobarbital in executions, because

18 Virginia does have a 3-drug protocol.

19      THE COURT:  Has a what?

20      MS. PEIFFER:  A 3-drug protocol.

21      THE COURT:  A 3-drug protocol.  Okay.

22      MS. PEIFFER:  In Texas, where the drugs are obtained,

23 and where they've been compounding drugs, and using

24 compounded drugs purported to be pentobarbital for at

25 least two years, as far as we know, that's a 1-drug

1  protocol.  So that's a very, very different kind of risk.

2      If Texas uses a 1-drug protocol, compounded

3  pentobarbital, and something goes wrong, they could give

4  the inmate more pentobarbital, or they could stop the

5  execution.  They would realize that the inmate is having

6  some kind of issue.

7      In Virginia, the second two drugs -- the second drug

8  would paralyze the inmate, so there may well be no way to

9  even tell what is happening because he would be paralyzed

10  after the administration of the second drug.

11      As you may recall from previous cases, there's been

12  testimony from the Department of Corrections that the

13  lethal injection protocol in Virginia can be as quick as

14  two to four minutes.  So it moves very quickly and it's

15  difficult to tell, because of the paralytic as the second

16  drug, what is actually happening with the inmate.

17  However, as the Supreme Court found, an inmate could

18  indeed experience significant risk of pain, and this would

19  violate the Eighth Amendment.

20      THE COURT:  Ms. Peiffer, will your evidence show that

21  an alternative source or alternative methodology, which is

22  one of the things a lot of courts have looked to, will

23  your evidence show that pentobarbital is fairly reasonably

24  available here in Virginia at that level so that the

25  Department of Corrections could go to a different source?

1          MS. PEIFFER:  An answer to a slightly different

2     question --

3          THE COURT:  No.  No.  I want -- this is my question.

4          Is pentobarbital available to the Department of

5     Corrections in Virginia from an alternative source?

6          MS. PEIFFER:  To my knowledge it is not, but that is

7     not something I have investigated.

8          THE COURT:  Okay.  That's a fair answer.

9          MS. PEIFFER:  We have pled that there are reasonable

10    alternatives.  And in fact, I think one of the things that

11    we really want to highlight today is that it could be that

12    these drugs are suitable.  We are not saying that the

13    Department of Corrections in Virginia could never use

14    compounded pentobarbital.

15         THE COURT:  But haven't Federal Courts around the

16    country admonished litigants that they're not allowed to

17    supervise the execution process?  That that really resides

18    in the hands of government officials entrusted by the

19    people of the State?

20         MS. PEIFFER:  I don't consider this supervising the

21    execution process, Your Honor.  All that we're saying is

22    that this drug needs to be properly --

23         THE COURT:  Well, it's a fairly granular examination

24    here.

25         MS. PEIFFER:  I'm sorry?

1      THE COURT:  It's a fairly granular examination that
2  you want to conduct.  You admit that.

3      MS. PEIFFER:  Well, there are a lot of -- there is a
4  lot of information that is significant here.

5      THE COURT:  All right.

6      MS. PEIFFER:  But part of the reason that we're
7  concerned is because, from the evidence, the Virginia
8  Department of Corrections is -- has not performed the type
9  of investigation that is necessary.

10      THE COURT:  Okay.

11      MS. PEIFFER:  If we had made this request that we
12  made it very shortly after we found out that they were
13  going to use this compounded substance, if they had been
14  able to respond appropriately, we would not be here today.
15  If they had advised Mr. Prieto that this is what was going
16  to be happening, that they were switching from midazolam
17  to compounded pentobarbital, we would have been able to
18  investigate this much sooner.

19      Mr. Prieto did not receive notice of this change
20  until the night of September 22nd.  As soon as
21  practicable, we wrote a letter to the defendants asking a
22  series of questions.  And that's one of the exhibits.  And
23  asking for some information about the type of testing
24  because there is this concern.  And we received an answer
25  the night of the 29th.

1       And frankly, Your Honor, that answer just really

2   didn't alleviate our concerns.  It made them worse because

3   it indicated that there's not an understanding about what

4   compounded pentobarbital is, how it's different from

5   manufactured pentobarbital, and why that's a risk.

6       If those documents had been produced as we asked, and

7   they had showed that there was sterility testing, and they

8   had showed that the potency was tested, and there was

9   reason to believe that this drug works the same as

10  manufactured pentobarbital, that would be a feasible

11  alternative.  We are not saying that there are no

12  circumstances under which the Department of Corrections

13  could use compounded pentobarbital.  That's absolutely not

14  what we're saying.

15      So we have suggested that there are other feasible

16  alternatives in addition -- in the material that we filed

17  today in response to the motion to dismiss filed

18  yesterday.  We suggested that another alternative would be

19  to use a 1-drug protocol because the risk here is very

20  significant because, in part, Virginia uses a 3-drug

21  protocol.  So there are a number of alternatives we

22  suggested, and the alternative doesn't have to be

23  manufactured pentobarbital.

24      THE COURT:  Okay.

25      MS. PEIFFER:  I hope that answered your question.

1          THE COURT:  Thank you very much.  Yes, ma'am.

2          MS. PEIFFER:  Did you have a need for further

3  questions?

4          THE COURT:  Not at this point.  After I hear the

5  evidence, I very well may.  Thank you.

6          MS. PEIFFER:  Thank you.

7          THE COURT:  Ms. O'Shea, opening statement?

8          MS. O'SHEA:  Yes, Your Honor.

9          Preliminary injunctive relief is a very serious

10  remedy that's asked -- that the plaintiff has asked this

11  Court to issue.  It's not to be taken lightly.  They're

12  not entitled to it as a matter of right simply because

13  they filed this Section 1983 suit.  Issuing preliminary

14  injunctive relief of a stay of execution is an

15  extraordinary remedy, and it's not warranted under the

16  facts of this particular case.

17          The plaintiff's alligations are based on suppositions

18  and speculation, which are insufficient to satisfy the

19  standard of proof required to show an Eighth Amendment

20  claim, which is that there's a serious and substantial

21  risk of injury.  There is no serious and substantial risk

22  of injury in this particular case.  Pentobarbital, under

23  Virginia's execution protocol, is not used as the lethal

24  agent.  It is used as a sedative.

25          Virginia has built sufficient safeguards into their

1  actual execution protocol to ensure that if the sedative

2  is not working, we will know about it.  In addition to

3  that, the Department of Corrections made reasonable

4  inquiry when they contacted Texas to request the

5  pentobarbital.  The Virginia Department of Corrections

6  ensured that the pentobarbital is transported in a safe

7  and secure manner.  And we will present testimony on that

8  to the Court today.

9       And so for that reason, the plaintiff is not going to

10  be able to show that there's a substantial risk of serious

11  injury, and as such, he doesn't have a likelihood of

12  prevailing on the merits of this action.

13       They also do not have a likelihood of prevailing on

14  the merits of this action because they are not able to

15  proffer to the Court an available, an alternative, method

16  of execution.  The alternative that they have proposed is

17  basically do more testing than what you've already got.

18  That's not a different protocol.  That's just attempting

19  to slap the Department of Corrections with a

20  constitutional requirement that simply does not exist.

21       Every single Federal Court of Appeals that has

22  addressed this particular issue, the Fifth Circuit, the

23  Eighth Circuit, the Eleventh Circuit, has said that the

24  suppositions put forward by inmates who challenge

25  compounded pentobarbital are simply insufficient to save

1    an Eighth Amendment claim.

2         In addition, the plaintiff has now exhausted his

3    administrative remedies, and that is a secondary reason

4    why there's no likelihood of success on the merits.

5         THE COURT:  I think you concede, it's a little late

6    at this point to pursue administrative remedies.

7         MS. O'SHEA:  Well, it is.  But 42 U.S.C. 1997e(a)

8    requires it.  It's mandatory.

9         THE COURT:  All right.

10        MS. O'SHEA:  That you have to do it.  And he didn't.

11        THE COURT:  All right.

12        MS. O'SHEA:  And the Supreme Court has said that

13   applies in lethal injection protocols, too.

14        THE COURT:  All right.

15        MS. O'SHEA:  If he found out on the 22nd that he was

16   going to be executed with compounded pentobarbital, as

17   they have posited, you can start the grievance process

18   right then.  He didn't.

19        THE COURT:  All right.

20        MS. O'SHEA:  So, Your Honor, the balance of the

21   equity is irreparable harm.  In the end, this all falls

22   out against issuing extraordinary remedy and preliminary

23   injunctive relief, against issuing a stay of execution of

24   this man who has been waiting for 27 years since his

25   crimes to be executed, and we're going to ask the Court to

1 vacate the ex parte temporary restraining order that was

2 issued yesterday, and deny their request for preliminary

3 injunctive relief.

4      THE COURT:  Thank you, Ms. O'Shea.

5      Ms. Peiffer or Mr. Lee, go ahead and present your

6 evidence.

7      MS. PEIFFER:  Yes, Your Honor.  Our witness has to be

8 reached by telephone.

9      THE COURT:  I can't hear you.  I'm sorry.

10      MS. PEIFFER:  I apologize.

11      THE COURT:  No.  It's okay.

12      MS. PEIFFER:  We have one expert witness, Your Honor.

13 And he is in the State of Utah.

14      THE COURT:  That's fine.

15      MS. PEIFFER:  So he has to be reached by telephone.

16 We have made arrangements.

17      THE COURT:  We can do that.  What I want you to do

18 though is because my court reporter is going to take this

19 down, I want to make sure that it is sufficiently audible

20 that she can hear it, and that you speak slowly, as well

21 as your expert, okay?

22      MS. PEIFFER:  Yes.

23      THE COURT:  All right.  Very well.

24      On that note, go right ahead.

25      MR. LEE:  Your Honor, should we recess to set that

1  up?

2       THE COURT:  Do you need a short recess?

3       THE CLERK:  Your Honor, no.  I just need to dial the

4  number.

5       THE COURT:  I think we're ready, Mr. Lee.

6       THE CLERK:  Could I get counsel to confirm that

7  number, Your Honor?

8       THE COURT:  Yes.

9       Mr. Lee or Ms. Peiffer, come up to the Clerk's desk

10  and confirm the phone number before she calls.

11      MS. PEIFFER:  Sure.

12      THE COURT:  What is this witness's name, Ms. Peiffer?

13      MS. PEIFFER:  James Ruble.

14      THE COURT:  Could you spell that last name for my

15  court reporter.

16      MS. PEIFFER:  Yes.  R-U-B, as in boy, L-E.

17      THE COURT:  Mr. Ruble?

18      DR. RUBLE:  Yes, sir.

19      THE COURT:  This is Henry Hudson.  I'm the United

20  States District Judge trying this case.

21      DR. RUBLE:  Yes, Your Honor.

22      THE COURT:  Before your counsel asks you questions,

23  my courtroom deputy clerk, Ms. Pizzini, is going to

24  administer the oath.

25      Ms. Pizzini, go right ahead.

1          THE CLERK:  You do solemnly swear that the testimony

2  which you are about to give, in this case, before this

3  Court, shall be the truth, the whole truth, and nothing

4  but the truth, so help you God?

5          DR. RUBLE:  I swear.

6          THE CLERK:  Thank you.

7          THE COURT:  Go right ahead.

8          Whereupon, **Dr. James H. Ruble**, having been

9  duly sworn in, testifies as follows:

10                       **DIRECT EXAMINATION**

11  BY MS. PEIFFER:

12  Q    Dr. Ruble, can you hear me okay?

13  A    I can hear you.  Yes, ma'am.

14  Q    Okay.  Good afternoon.

15  A    Good afternoon.

16  Q    I would like to start by just having you introduce

17  yourself to the Court, and briefly describe your

18  credentials to opine on these matters.

19  A    My name is James Hoffman Ruble.  My current

20  employment is as a associate professor in the clinical

21  ranks at the University of Utah, College of Pharmacy,

22  located in Salt Lake City, Utah.  I've been an instructor

23  here in a full-time capacity for the past five and a half

24  years.  And prior to that, I taught in an adjunct capacity

25  for more than 20 years.

1    I've been a registered pharmacist in the State of

2  Utah since 1992.  And I have experience in a variety of

3  areas in pharmacy practice.  And a fair number of those

4  years have been spent in both sterile compounding

5  activities, professional activities, as well as in

6  nonsterile compounding activities.

7    In my current role as an instructor and educator, I

8  teach pharmacy students.  And I teach pharmaceutical

9  science to graduate students in the areas of compounding,

10 I teach in pharmacy law, and I teach in medical ethics.

11 And in a hand full of other courses, I provide additional

12 instruction.  Those are the three primary areas though.

13    I've worked in a number of major academic medical

14 centers, including the University of Utah, Health Care

15 System, located in Salt Lake City.  I've worked for

16 Primary Children's Medical Center, a pediatric

17 institution, located in Utah.  I've worked for an adult

18 and pediatric institution located in Pennsylvania.  And in

19 a number of other community pharmacy areas.

20    I was a manager of a home infusion pharmacy, also in

21 connection with the University of Utah.  We did sterile

22 compounding activities.  A lot of that work was for

23 patients residing in an ambulatory environment in their

24 home or in hospice settings, or otherwise.

25    So there are a number of other qualifications I could

1   go into, but I think as long as I have, you know, more

2   than 20 years of experience as a pharmacy practitioner

3   licensed, and a lot of that time spent in direct

4   compounding activities --

5        THE COURT:  Go right ahead.

6        MS. PEIFFER:  And so I would move that Dr. Ruble be

7   considered as an expert in the compounding matter.

8        THE COURT:  Ms. O'Shea, is there any challenge to his

9   credentials?

10       MS. O'SHEA:  Not to his credentials as a -- as a

11  pharmacist.  But with respect to tying that to

12  compounding, I don't think that we have heard any

13  particular --

14       THE COURT:  He mentioned that his experience did

15  involve compounding pharmaceuticals.

16       MS. O'SHEA:  Okay.

17       THE COURT:  He will be received as an expert, and

18  permitted to give expert testimony in the area of

19  pharmaceuticals.  Is that what you're seeking?

20       MS. PEIFFER:  Compounding, Your Honor.

21       THE COURT:  Compounding.  Yes, ma'am.  He'll be

22  received in that limited area.

23       Go right ahead.

24       MS. PEIFFER:  Thank you.

25  BY MS. PEIFFER:

1   Q     Dr. Ruble, did you have occasion to speak with me,

2   Elizabeth Peiffer, and Robert Lee on some occasion

3   approximately a week ago?

4   A     Yes, ma'am.

5   Q     And did we ask you to review certain records?

6   A     Yes, ma'am.  I have reviewed a couple of different

7   documents that you provided to me.

8   Q     And did some of those documents involve information

9   about compounded pentobarbital in the possession of the

10  Virginia Department of Corrections?

11  A     Yes, ma'am, they did.

12  Q     Can you just briefly describe for the Court the

13  documents that you reviewed concerning this compounded

14  substance?

15        THE COURT:  Yes, ma'am.

16        MS. O'SHEA:  It's fine, Your Honor.  I'll hear what

17  the documents are.  But until we can ascertain what they

18  are, I might have some sort of basis for objecting.

19        THE COURT:  Well, you're going to have to -- are you

20  going to put these documents physically into evidence?

21        MS. PEIFFER:  Your Honor, they are already in

22  evidence.  But I would be happy to put in additional

23  copies.

24        THE COURT:  Well, they couldn't possibly be in

25  evidence because you've introduced no evidence in this

1   hearing yet.  They could be appended to your documents.

2        MS. PEIFFER:  They are.

3        THE COURT:  To your filings.

4        MS. PEIFFER:  And we can introduce them as evidence.

5        THE COURT:  Well, I think you should introduce them

6   as evidence.  And specifically identify which document

7   you're referring to before the doctor gives any kind of an

8   explanation, all right?

9        MS. PEIFFER:  Absolutely.

10       THE COURT:  Go right ahead.

11  BY MS. PEIFFER:

12  Q    So, Dr. Ruble, did you have occasion to review a

13  photograph of three bottles?

14  A    A photograph of three vials was supplied to me.  Yes,

15  ma'am.

16  Q    And what did you see in that photograph?

17  A    According to the label --

18       THE COURT:  Hold on just one second.

19       Do you have that document?

20       MS. PEIFFER:  Your Honor, we're getting it.

21       THE COURT:  All right.  Let's have Ms. Pizzini mark

22  it as an exhibit, and make it a part of the record in the

23  case.

24       MS. PEIFFER:  Okay.  Thank you.  I'm sorry.  I'm not

25  use to doing this over the telephone.

1     THE COURT:  I understand that.  But at some point,

2  another Court may need to review my decision one way or

3  the other.  We want to make a complete record, and a clear

4  record, okay?

5     MS. PEIFFER:  Absolutely.

6     THE COURT:  All right.

7     DR. RUBLE:  Ms. Peiffer?

8     MS. PEIFFER:  Yes.  Just one moment.

9     DR. RUBLE:  Okay.  Yes, ma'am.

10     THE COURT:  So this document will be marked as your

11  Exhibit 1.

12     Is there any objection, Ms. O'Shea?

13     MS. O'SHEA:  No, sir.

14     THE COURT:  It will be received as your exhibit

15  without objection.

16          (Plaintiff's Exhibit 1 is received.)

17     THE COURT:  Go ahead and ask the Doctor the next

18  question.

19     MS. PEIFFER:  I think, if it's acceptable to Your

20  Honor, since this is a little bit awkward, we'll just go

21  ahead and put -- there are only three documents.  We can

22  put them into evidence, and then we can --

23     THE COURT:  Yes, ma'am.  Go right ahead.  Put them

24  all in at one time.

25     MS. PEIFFER:  Great.  I think that will be most

1  efficient.

2  BY MS. PEIFFER:

3  Q     Dr. Ruble, did you also have occasion to review a

4  form that was a Drug Enforcement Administration order

5  form?

6  A     Yes, Ms. Peiffer.  That form appears to be a copy of

7  a DEA 222 form.

8        THE COURT:  And that's the form that you saw, Doctor,

9  is that correct?

10       DR. RUBLE:  I believe so, Your Honor.

11       THE COURT:  All right.

12       Any objection, Ms. O'Shea?

13       MS. O'SHEA:  There's not, Your Honor.

14       THE COURT:  That will be received.

15            (Plaintiff's Exhibit 2 is received.)

16       THE COURT:  All right.  Give it to the Marshal.  It

17  will be made a part of the record.

18       Next document.

19  BY MS. PEIFFER:

20  Q     And the last document that I'm going to ask you about

21  right now is a laboratory report with a number of

22  redactions, but it concerns pentobarbital Lot Number

23  04142015, ampersand, 8.

24       THE COURT:  What was the last thing you said?

25       MS. PEIFFER:  Ampersand 8.

1       THE COURT:  Ampersand?

2       MS. PEIFFER:  The "at" symbol.  Yes.

3       THE COURT:  Okay.

4       Did you see that document, Doctor?

5       DR. RUBLE:  Yes, Your Honor, I did.

6       THE COURT:  All right.

7       Any objection, Ms. O'Shea?

8       MS. O'SHEA:  No, Your Honor.

9       THE COURT:  Be received.

10          (Plaintiff's Exhibit 3 is received.)

11      THE COURT:  Go right ahead.

12      DR. RUBLE:  Yes, Ms. Peiffer.  I'm waiting.

13      MS. PEIFFER:  Just one moment.

14      DR. RUBLE:  You bet.

15      THE COURT:  All right, Ms. Peiffer, go ahead with

16  your next question of Dr. Ruble.

17  BY MS. PEIFFER:

18  Q   Dr. Ruble, going back to the photograph that you

19  reviewed.  What information were you able to glean from

20  looking at the bottles in the photograph?

21  A   I have a black -- I believe that the document

22  transmitted to me was in color.  The one I'm currently

23  looking at is in black and white.  But those appear to be

24  amber colored glass vials commonly used for the

25  formulation of injections for intravenous, or what we

1  call, parenteral administration, typically injected into

2  the bloodstream.

3       They are labeled with what appeared to be exactly the

4  same identical labels that identify the solution in there

5  as being pentobarbital as the -- what we call the active

6  pharmaceutical ingredients in there.  A concentration of

7  them, which is labeled as 50 milligrams per millimeter of

8  volume.

9       The next line down has three initials, or an acronym,

10 which is MDV, set in solution 50 mls, which would indicate

11 that it would be filled with a 50 ml volume.  The MDV, at

12 least in this field or art, is normally associated with a

13 product being identified as a multi-dose vial.

14      The third line down below has a lot number, which is

15 the same lot number that Ms. Peiffer just read off in

16 relation to a laboratory report, that being 04142015, with

17 an @ sign, and the number 8.  And then what is called a

18 use by date, which is 4/14/2016.

19 Q    Thank you.

20 A    Yes, ma'am.  And --

21 Q    I'm sorry.  Was there something else that you

22 observed about those bottles?

23 A    Well, the bottom edge of the label appears to have

24 been cut or scoriated in some fashion with a razor blade.

25 Presumably that was to redact identifying information of

1   some other element.  So what I would say is that normally

2   in compounding perspectives, there would be additional

3   information that would need to be required on the label,

4   which presumably was redacted in some fashion for the

5   purposes of this proceeding.

6   Q     And from the lot number and the use by date, what can

7   you tell us about the time between the creation of the

8   mixture and the use by date?

9   A     Well, these labels are familiar to me in my practice.

10  I can't say with 100% certainty, but they are very similar

11  in format and structure to labels generated by a computer

12  software program that is commonly utilized by compounding

13  pharmacists.  The formatting of them, obviously that could

14  be duplicated through other programs, but it's very common

15  of compounding pharmacies to use this particular program

16  on here.

17       The lot number itself, again, not knowing with

18  certainty on this, but a high belief of certainty that

19  that lot number, as is customarily done in this practice,

20  the lot number would indicate the date upon which the

21  compounded sterile preparation was actually prepared.  So

22  I would interpret that as saying that the preparation was

23  made on the 14th day of April of 2015 at 8:00 a.m., or

24  perhaps not exactly the minute of 8:00 a.m., but in

25  essence at 8:00 a.m. in the morning.

1          The use by date is then extended approximately to one

2   year from the date of -- if we go in that customary

3   process.

4   Q    What is the difference between compounded

5   pentobarbital and manufactured pentobarbital?

6   A    That is -- that is a very good question.   A

7   compounded -- well, many times incorrectly -- although you

8   didn't use it incorrectly, it is incorrectly stated that

9   these are compounded products.   And really, these are

10  compounded preparations.   That's what's distinguished in

11  The United States Pharmacopeia, which has a lot of

12  guidance about compounding practices.

13         So these are things -- these are preparations that

14  are made that are intended for use in some sort of a

15  patient.   Normally a human patient, but it can also

16  incorporate in an animal patient.   Preparations that

17  include an active pharmaceutical ingredient that are made

18  in some fashion to render it so that it can be

19  administered to a patient.

20         The same is true of a commercial product, but it is

21  made under the blueprint and under the processes that

22  involve good manufacturing practices.   That's why they're

23  called an article of manufacture or a commercial product,

24  whereas these are called compounded preparations.

25         Commonality to them, they involve an active

1  pharmaceutical ingredient.  So we're all aware that there

2  are commercial products for pentobarbital, and that they

3  are made in the strength of 50 milligrams per ml.  They

4  can come in a volume size of 50 milliliters.

5       This is, in essence, what is intended to be, or at

6  least, a substitute product for a substitute preparation

7  for the product that has tried to emulate it as close as

8  can be done, but they are not considered the same, if you

9  will, drug in this case.  We will look at it in that way.

10 It is a preparation as opposed to a product.  You have an

11 API.  The same concentration as stated on the label.

12      Compounding preparations typically go in accordance

13 with the set of USP guidelines, a specific chapter in

14 there that is called 797, that deals with the preparation

15 of sterile formulations.  It was released by <u>The United</u>

16 <u>States Pharmacopeia</u> as a general guidance chapter in 2004.

17 It did not become mandatory for pharmacies -- for

18 pharmacists to comply with until roughly 2008.  And

19 various states have different levels of incorporation of

20 this into their pharmacy practice acts.

21      Good manufacturing practices, which is what

22 commercial products are made by, were first introduced in

23 1962 in --

24      THE COURT:  Doctor, could you hold off a second?

25      DR. RUBLE:  Yes, Your Honor.

1    THE COURT:  I think this a little bit beyond the

2  initial question that you asked.  I think we should

3  proceed by question and answer.  So why don't you ask your

4  next question.

5    MS. PEIFFER:  Of course.

6  BY MS. PEIFFER:

7  Q    Is there a difference between compounded

8  pentobarbital and manufactured pentobarbital in terms of

9  F.D.A. regulations?

10 A    A commercial product undergoes a formal evaluation

11 prior to being allowed in interstate commerce.  It is a

12 licensing process.  So it is a formal approval process

13 that the F.D.A. conducts to allow that product to move

14 through interstate commerce.

15    Compounded preparations are specifically exempted

16 under the Food, Drug, and Cosmetic Act from the same

17 licensing process.  So, in essence, they are given an

18 exemption, or a waiver from licensing, by the F.D.A.  They

19 are not formally evaluated by the F.D.A.

20 Q    And in terms of that F.D.A. evaluation process, what

21 does that mean in terms of the reliability and variability

22 of compounded batches of pentobarbital versus a

23 manufactured pharmaceutical that is labeled pentobarbital?

24 A    Yeah, I'm not -- I'm not sure of a specific answer.

25 Can you rephrase that?  Let me see if I can give you a

1  more specific and narrow answer to the question.

2  Q    Of course.  Is there a difference in terms of how

3  these materials are handled and treated, and how reliable

4  they are if on the one hand you have a manufactured

5  pharmaceutical pentobarbital, and on the other you have a

6  compounded mixture of pentobarbital?

7  A    Okay.  Thank you for rephrasing the question on

8  there.  My -- I'll try to keep this answer quick.

9       In this respect, according to the preparation and the

10  evaluation from a commercial product, many times they're

11  produced in accordance with what's called good

12  manufacturing practices, which are very detailed pages.

13  And more often than not, they are proceeded by the

14  development of a monograph in The United States

15  Pharmacopeia, which have very exacting requirements for

16  the commercial products in terms of what their potency may

17  be, and how they are analyzed qualitatively and

18  quantitatively to insure that they meet the guidelines

19  that are delineated through a scientific document, the

20  monograph.  And I believe that that may come up later on.

21       Compounded preparations, on the other hand, are --

22  compounded preparations proceed by what's called a general

23  guidance in their process.  So we -- there isn't

24  necessarily a published document from the USP that tells

25  pharmacists here's how you exactly compound pentobarbital.

 1  There are, on occasion, published recipes that are out

 2  there.  And in fact, I've searched wide and far for a

 3  published recipe on compounding of pentobarbital, and it's

 4  not out there.  At least not that I've encountered.

 5      Having said all that, the tolerance limit in terms of

 6  what the error limits are, they go by a general nature of

 7  plus or minus 10%; whereas, the tolerance limits can be

 8  much more narrow from the standpoint with commercial

 9  products.

10  Q    And could you briefly describe the process of

11  compounding pentobarbital, and how APIs are used and what

12  APIs are?

13  A    An API, by definition under USP and other texts,

14  stands for Active Pharmaceutical Ingredients.  So one way

15  to think about these -- and I'm heeding Your Honor's

16  instructions, and I will keep this as narrow as possible.

17  Please cut me off if this exceeds the scope.

18      An API, an Active Pharmaceutical Ingredient, is

19  really the chemical that's involved in the formulation.

20  But the formulation itself we have to think of as a

21  system.  It involves many components.  In this case, a

22  diluent or a solution.

23      There may be other inactive ingredients in there that

24  don't -- that aren't intended to affect the body of the

25  patient or their physiology in some way, but help, for

1  example, to keep the drug in solution.  There could be

2  preservatives added sometimes.  That's not always true.

3  So there are many elements that could go into it, into the

4  formulation, the creation of the final preparation.  Those

5  are delineated in the commercial, what we call, package

6  insert, for commercially made pentobarbital.  I have no

7  way of knowing what those other ingredients are, based on

8  the label.  All I know is in this case that the

9  pentobarbital, active pharmaceutical ingredient, is

10 labeled as being in the solution.

11      I alluded to when I looked at the labels and said

12 that this is classified as a multi-dose vial, that would

13 imply, although I don't know with certainty, that there is

14 some sort of a preservative that's in this.  That would

15 tend to perhaps distinguish it somewhat from the

16 commercial products, depending on the formulation.  Many

17 of the commercial products do not necessarily have

18 preservatives in them.  They have citric acid, and other

19 kinds of elements in there, that help to buffer the pH.

20 But that already could be a potential distinguishing

21 element, saying that they're not exactly the same

22 formulations.

23      So anyway, yes.

24 Q    And could you just describe how the environment in

25 which, or the place, the compounding pharmacy, where a

1   substance or mixture is made, could affect how the mixture

2   works?

3   A    Sure.  Thank you, Ms. Peiffer.

4        In accordance with the USP 797 document, I stated

5   that before, which gives general guidance on the

6   compounding of sterile preparation, preparations that are

7   made that are sterilely compounded that begin with a bulk

8   powder form of an active ingredient, which is likely what

9   occurred in this scenario.  And again, I don't have the

10  recipe that the pharmacy actually used in preparing this.

11  I would presume that's the case.  That it began what a

12  sterile -- pardon me.  That it began with a bulk powder

13  that is a pharmaceutical grade chemical, but is not

14  necessarily sterile.

15       That amount would be weighed out.  It would be mixed

16  with the proper diluent, and whatever other elements are

17  called for in the recipe, and it would be formulated

18  together.

19       That type of compounding has to occur in a very

20  controlled, engineering controlled, facility in terms of

21  the atmospheres that are created.  It has to be a sterile

22  atmosphere.  There are primary and secondary engineering

23  controls.  It is a very technical process.  In essence,

24  these are the embodiments of clean rooms.

25       In most circumstances, they're as clean and as

1 sterile as an operating room.  That is the equivalent to

2 them.  It takes people of -- it takes professionals of

3 good skill and good knowledge, to understanding behind

4 those engineering dynamics and incorporation of it, in

5 order to successfully practice to create this system.

6       When a compounded sterile preparation begins, it's

7 formulated beginning with an API that is of non-sterile

8 character to begin with.  It is deemed to be what's called

9 a high-risk compounded preparation.  High-risk meaning

10 that the risk is associated that there is a potential

11 likelihood for contamination of a process, and extra due

12 diligence and care needs to be taken to minimize that.

13       That includes the process of what we call terminal

14 sterilization.  There are a number of ways within which

15 that can be conducted.  But once the powder has been

16 dissolved in the solution, the solution has been created,

17 it needs to be in some fashion sterilized before it can be

18 administered to the patient.

19       Sterilization can happen a number of different ways.

20 I can't say all compounding pharmacies, but in most of

21 them it is conducted through terminal sterilization,

22 meaning that it's passed through a filter and then

23 placed -- and it would be placed into the vial as depicted

24 in the photograph that we have in evidence.

25       There can be other forms -- other ways to sterilize,

1  including autoclaves.  And there are a few other

2  methodologies which are less commonly used.  But the

3  vast -- the vast bulk of it is through a filter that is

4  sterilizing.  That would remove the bacteria from the

5  vials.

6  Q    And would compounded pentobarbital be a high-risk

7  sterile injectable?

8  A    I would classify it as such if it had been derived

9  from a powder form initially, which I can't think of any

10 other way that it would be compounded.  Manufacturers, to

11 my knowledge, at least from a bulk standpoint, don't

12 provide it in a liquid solubilized form.  I believe they

13 don't.  Where we've known about it being available in the

14 past through various kinds of pharmacy vendors, to my

15 knowledge, it was supplied as a solid powder form for

16 compounding purposes.

17 Q    And you mentioned "active pharmaceutical ingredients"

18 in bulk powders.  Are there any risks associated with

19 using these ingredients?  Are you able to tell very much

20 about the ingredients themselves?

21 A    I'm sorry.  I didn't follow the question completely.

22     I would say that in general there are two really

23 overarching concerns that we worry about.  There are many,

24 but two really primary concerns.  One would be is what's

25 called the sterility of the finished product, and the

1   stability of the finished product.

2        The sterility would go to could it have been

3   contaminated at some point during the preparation process,

4   or after its preparation, as a result of the conditions of

5   its storage or, if you will, chain of custody.  I don't

6   mean it from a legal sense.  I mean it from the

7   perspective of how is it actually stored, was it done

8   under the properly designated conditions through the USP,

9   and through other guidance documents.  So the sterility of

10  the product, and whether or not there's a risk that

11  microorganisms could have been somehow introduced into the

12  process.

13       We would like to say that it's 100% effective with a

14  sterilization filtered process, but that's not always

15  true.  They are very effective, but they're not always

16  complete.  That's why we have to have ongoing surveillance

17  to make sure the products remain fit for their intended

18  use.  So sterility is one element of the process.

19       Sterility can be from what are called -- can be

20  contaminated from the standpoint of microorganisms.  They

21  can also be contaminated from the perspective of things

22  that are not necessarily growth-capable microorganisms,

23  but maybe dust particles or other particulates.  Things

24  that aren't necessarily living, but they can cause illness

25  or disease in the patient through a lot of different

1  mechanisms on there.  That's on the one side.

2      The other concern would be, at least in the

3  compounding process, is that it was prepared in such a way

4  to minimize the decay in its potency.  Now, over time, all

5  drugs will decay to some degree.  And depending upon what

6  their dosage form is, some decay much more quickly than

7  others do.  For most medications that we use, and

8  pentobarbital is included in this, they are some sort of

9  either organic acids or an organic base.

10      Those particular types of chemical compounds are

11  highly prone to degradation when they are exposed to

12  water.  So water is convenient.  It makes this an easy to

13  administer -- easier to administer dosage form because it

14  puts it in a soluble form that can be drawn up into a

15  syringe that can be injected into a patient.  But at the

16  same time, that water medium is the medium that promotes

17  degradation.  It's through what's called a hydrolytic

18  reaction.

19      THE COURT:  I think, Ms. Peiffer, we need to proceed

20  by question and answer at this point.

21      DR. RUBLE:  Thank you, Your Honor.  Sorry.

22      THE COURT:  Why don't you focus your questions rather

23  than just let the professor lecture.

24      MS. PEIFFER:  Of course.

25  BY MS. PEIFFER:

1  Q    Is there a difference between sterility testing and

2  potency testing?

3  A    A sterility test would be used to test to see if

4  there are contaminates in the final preparation.

5       A potency test would be used in some way to

6  quantitatively or numerically quantify how much of the

7  original API is still there in the solution.

8  Q    And are those different tests that are performed on a

9  mixture?

10 A    I have not physically performed those tests.  I

11 believe I'm well-read on those tests and understand it,

12 and educate professionals about those kinds of tests, but

13 they are two separate kinds of testing procedures that are

14 performed.

15 Q    I want to turn to a term you mentioned earlier,

16 *"beyond use date"*.  Can you please describe what that

17 means.

18 A    Beyond use dates are applied to compounded

19 preparations.  And they are the date beyond which we don't

20 have as much faith, I guess, if you will, or confidence,

21 that the product still remains fit for the intended use of

22 it.  And that could either be used to concerns about

23 sterility, but more often than not, they're due to

24 concerns about whether or not the product retains the

25 potency, as specified, that needs to be maintained.

1    That is differentiated from an expiration date.  An

2  expiration date is a different entity.

3  Q    What is the difference?

4  A    An expiration date is applied to a commercial

5  product.  And it is the result of very rigorous testing

6  that occurs by a chemical -- by a pharmaceutical

7  manufacturer under really sophisticated laboratory

8  instrumentation that they have available to them, HPLC.

9  And there are a number of other tests involved.

10 Q    And could you describe briefly how a beyond use date

11 is determined for a high-risk sterile injectable?

12 A    Well, there are -- for a high-risk sterile compounded

13 preparation, a beyond use date in the absence of specific

14 scientific testing, are established through what's called

15 an empiric guideline.  So it's just basically, in

16 Chapter 797, as I previously discussed, there are general

17 guidances about how we apply beyond use dating.

18    So we don't have specific testing on the preparation.

19 The beyond use dating for a high-risk compound sterile

20 preparation, if the preparation is maintained at room

21 temperature, it is deemed a beyond use date of 24 hours or

22 less.  If it is refrigerated, it is actually called a

23 controlled cool temper.  But we all interpret that as

24 refrigerated.  That means that it is available for three

25 days from the date of preparation.  And if it were somehow

1  to be frozen in a solid frozen state, it could be extended

2  45 days.

3       Now, where there is specific quantitative studies

4  done on it through a sterility test and a potency test, on

5  occasion those dates can be extended.

6  Q    And what kind of testing would need to be done in

7  order to extend a beyond use date beyond the period you

8  just described?

9  A    Well, they would be both a -- well, they, whoever.

10  Typically, it would be the pharmacy compounder that's

11  preparing it.  If they were going to extend that, they

12  would have to do sterility testing and potency testing.

13  Q    And can --

14  A    The beyond potency would be called a stability test.

15  So there would be at least a couple potency

16  determinations.  There are other methodologies for it, but

17  that's one -- one way.

18  Q    Can compounded pentobarbital be frozen?

19  A    I haven't specifically evaluated that, frozen and how

20  it retains its stability.  Very few drugs can be frozen

21  for long periods of time.  This would be -- just based on

22  my experience, I would not want to do it because I think

23  it could potentially impact the overall stability of this

24  drug.

25       Freezing a chemical compound, subjecting it to those

1  kinds of forces, which put enormous strain and tension on

2  the chemical makeup of it, so before I froze it, I would

3  want to see some very specific scientific data saying that

4  that was possible.  And I'm not aware of any -- of that

5  data being published.

6  Q    So because of the restriction on freezing, if there

7  were not extended sterility and potency testing, what

8  would the beyond use date for compounded pentobarbital be?

9  A    For compounded high-risk pentobarbital, it would be

10 three days, or 72 hours, at a controlled cold temperature.

11 Q    Thank you.

12 A    You're welcome.

13 Q    So you mentioned earlier that when you reviewed these

14 records, you saw a beyond use date of April 14, 2016.

15 What is your opinion about this beyond use date?

16      THE COURT:  With respect to what?

17      MS. PEIFFER:  With respect to whether it is

18 reasonable, or would require further investigation.

19      THE COURT:  What specific sample are you talking

20 about?  Samples in general?

21      MS. PEIFFER:  In Exhibit 1.

22      THE COURT:  Okay.  Go ahead.

23      MS. O'SHEA:  I'm sorry.

24      THE COURT:  Yes, ma'am.

25      MS. O'SHEA:  Your Honor, I would object because he

1 has just testified that the beyond use date is going to

2 depend upon how it is compounded, how it is manufactured.

3 He can't give an opinion as to the validity of the beyond

4 use date because he doesn't have that information.  It

5 would be speculation.

6       THE COURT:  I think with respect to this sample, that

7 goes to the weight and not the admissibility.  Objection

8 is overruled.

9       Doctor, you may answer.

10       DR. RUBLE:  Thank you, Your Honor.

11       Ms. Peiffer, could you just repeat the question for

12 me so I make sure I get it right?

13       MS. PEIFFER:  Of course.

14 BY MS. PEIFFER:

15 Q    When you saw the beyond use date of 4/14/2016, which

16 was a year after manufacture, what was your opinion about

17 whether that is reasonable?

18 A     It seemed at the extreme end of any possibility that

19 I might do.  I'm customary to seeing compounded

20 preparations more in sort of the three to six month range.

21 I'm not suggesting that a 1-year expiration date is

22 impossible, but I would certainly, at least from my own

23 due diligence process, before I utilize that in a direct

24 patient care would want a little -- to know more about how

25 it was formulated.

1          I mentioned earlier that it said that it was a

2   multi-dose vial.  That's certainly an element --

3          THE COURT:  My objection is sustained.  He's now

4   beyond your question.  Next question.

5          DR. RUBLE:  Sorry, Your Honor.

6   BY MS. PEIFFER:

7   Q    And what would happen to a drug after its beyond use

8   date passes?

9   A    What would happen to it?

10  Q    Yes.

11  A    Well, it's hard to know for certain without specific

12  testing.  It could be related to either -- typically, it's

13  related to -- it does not have the potency that we would

14  want it to have to achieve its effect.

15  Q    And you had occasion to review a lab report last

16  night that is now Exhibit 3, is that correct?

17  A    I believe so.  Yes.  Exhibit 3.  That would be the

18  previously mentioned, or identified, laboratory report?

19  Q    Yes.  Exhibit 3.  From your review of that lab

20  report, can --

21         THE COURT:  He doesn't have the document in front of

22  him, so we need to make sure we're looking at the same

23  document.

24         Doctor, that's the document that's dated April 27,

25  2015.  Sir, do you have that?

1          DR. RUBLE:  I do, Your Honor.  I do have it in front

2   of me, a printed copy, Your Honor.

3          THE COURT:  Okay.

4          Go right ahead then.

5   BY MS. PEIFFER:

6   Q    According to that document, were any sterility tests

7   performed on the substance tested?

8   A    I do not see any indicated on this laboratory report.

9   Q    Was there a potency test performed?

10  A    There is a potency test that is indicated on here of

11  94.6%.

12  Q    And where does that fall within the acceptable range

13  for compounded pentobarbital?

14  A    I supposed it would depend on what guidelines are

15  being utilized here.  If it's in The United States

16  Pharmacopeia monograph, those are stated as being between

17  92% to 108%.

18         If there are 797 guidelines that are being involved

19  or incorporated, those would be -- those would be stated

20  at a plus or minus of 10% of the label percent -- plus or

21  minus 10% of the label amount, meaning that a range of 90%

22  to 110%.

23  Q    And as a compounded substance ages, what happens to

24  the potency?

25  A    We expect the potency to decrees.  I think that's

1  borne itself out in nearly every scientific matter.  We

2  don't see potency increase, to my knowledge, or at least

3  that's not in any regards to customary routine.

4  Q    Does the potency of the drug relate to the conditions

5  in which it is kept?

6  A    Absolutely.  Environmental factors are big influences

7  on the potency.  So those would be light, heat,

8  temperature, the chemical conditions in terms of pH.

9  There are a number of other elements.

10 Q    And in your knowledge about compounding and testing,

11 have you heard reports that testing laboratories have had

12 certain issues?

13     THE COURT:  Objection sustained unless this is simply

14 offered not for the truth of the matter, but only as a

15 foundation for an opinion he's going to give.  I'm not

16 going to accept it for the truth of the matter.  But if he

17 relied upon that in an opinion he's going to give, I will

18 overrule the objection.

19     Which is it?

20     MS. PEIFFER:  Your Honor, I will withdraw the

21 question -

22     THE COURT:  That's fine.  Go ahead.

23     MS. PEIFFER:  - and rephrase.

24     THE COURT:  Go ahead.

25 BY MS. PEIFFER:

1  Q     Are you familiar with the testing done by independent

2  laboratories of compounded substances, and the F.D.A.

3  regulation of these laboratories?

4  A     Not with intimate details.  I am generally aware of

5  them in terms of advising pharmacy licensees relative to

6  compounding manners about the need to test things.  And

7  quite normally, that is done through an outsourced

8  Contracted Laboratory that has some element of oversight

9  by the F.D.A., as well as other administrative agencies.

10  Q     If the F.D.A. issues a Form 483 report about a

11  testing facility, what does that mean?

12  A     Well, Form 483 reports are not just for testing

13  facilities.  They're also -- they are an expression of

14  concern issued by the F.D.A. to some sort of regulated

15  site, whether it be manufacturing, pharmaceutical

16  manufacturer, or a laboratory.  It could mean -- they have

17  even been issued to compounding pharmacies in the past.

18  And those are expressions of concern which required

19  detailed responses, including corrective actions, by the

20  person or entity that it's been issued to.

21       MS. PEIFFER:  Thank you.

22       Court's indulgence for a moment?

23       THE COURT:  Yes, ma'am.  Go right ahead.

24  BY MS. PEIFFER:

25  Q     Just to clarify a matter of acoustics.  I was asking

1   you about 483 reports.  Is that the question to which you

2   were responding?

3   A    Those are the -- that's the number that I'm familiar

4   with is 483.

5   Q    Okay.

6   A    That's correct.

7   Q    Thank you.  I think I might have misheard.

8        THE COURT:  All right.

9        MS. PEIFFER:  No further questions.

10        THE COURT:  All right.

11        Ms. O'Shea, cross-examination of the Doctor.

12                    **CROSS-EXAMINATION**

13   BY MS. O'SHEA:

14   Q    Good afternoon, Dr. Ruble.  My name is Margaret

15   O'Shea.  I'm with the Attorney General's Office.  I'm

16   going to ask you a few questions about what you just

17   testified about.

18   A    Yes, ma'am.

19   Q    When we were discussing, or you were discussing, the

20   potency of compounded products, you indicated that potency

21   relates to how much of the substance went into the

22   solution, is that correct?

23   A    I believe that's correct.  How much -- when the

24   product is chemically analyzed, the mass -- the amount of

25   that substance in the overall concentration of the -- in

1   the amount analyzed.

2   Q    Okay.  So over time, you said the potency of the

3   subject can decrease.  Would it precipitate out of

4   solution if that were happening?

5   A    That's one way within which the -- it could so then

6   come out of a solution form and precipitate into a solid

7   form.  It's not -- yeah.  That would be one way.

8        It could be chemically altered so that perhaps it is

9   altered to another chemical compound, which may or may not

10  have activity in the human body.

11  Q    So if another chemical compound were introduced into

12  what was already inside that particular compounded vial,

13  is that what you just said?

14  A    Well, that would be one way of it.  The actual

15  hydrolytic reaction could also convert it to another

16  chemical compound, which is then not active anymore.

17  Q    All right.  You had indicated that circumstances and

18  environmental conditions are very important to maintaining

19  the potency of the compounded pharmaceutical, correct?

20  A    That's correct, ma'am.

21  Q    So one of those is sunlight, for example.  So if you

22  take a compounded product and expose it to sunlight, that

23  could decrease its potency, yes?

24  A    That would be one way.  If I said sunlight, please

25  let me correct that.  I hope I didn't imply that it was

1  light.  So sunlight would be one way.  Even other kinds of

2  light forms, through florescent lights, and others, have

3  some element of causing degradation as well.

4  Q     Certainly.  Or if it were exposed to extreme cold or

5  heat, correct?

6  A     Those would be other manifestations we would be

7  concerned with.  Yes, ma'am.

8  Q     So would it be fair to say that if a substance were

9  kept out of the sunlight, out the light, and if it were

10  maintained at approximately room temperature, then that

11  would lessen your concerns regarding the decrease in

12  potency of that subject?

13  A     I don't know about the room temperature standpoint.

14  Some drugs, if they have been specifically analyzed, can

15  remain -- can have some -- well, all drugs will have a

16  decrees in their potency over time.  At room temperature,

17  some will hold that potency for a while.  But I would say

18  the answer to your question is it is preferable under most

19  circumstances to have these medications refrigerated.

20  Q     What about pentobarbital?  Do you have any knowledge

21  of that?

22  A     Well, pentobarbital, if we're compounding it in

23  accordance with the API guidelines of USP 797, we would

24  want to keep it refrigerated.  There are some scientific

25  reports that have shown, or at least ones that I know of,

1 that have talked about it being stable for up to 31 days

2 at room temperature, at least in a glass vial under those

3 circumstances.

4      I am not -- there may be longer duration reports.

5 I'm not specifically aware of them.  Thirty-one days is

6 the longest report that I have seen that has been

7 published.

8 Q    Have you ever made compounded pentobarbital?

9 A    I have not made it beginning from sterile bulk

10 powder.  I have compounded it from the commercial sources

11 to change the concentrations of it for use in clinical

12 administration of patients in neuro intensive care units.

13 But I've not made it from sterile bulk powder.  I have,

14 however, compounded and made other high-risk sterile

15 formulations beginning with bulk powder.

16 Q    I understand.  We're here today about pentobarbital.

17 So to the extent we can, I'd like to focus your answers on

18 that substance.

19 A    I have not made it before.  That's correct.

20 Q    Are you familiar with compounding pharmacies in the

21 State of Texas?  Have you ever visited one?

22 A    I have not visited one in the State of Texas, ma'am.

23 I'm familiar with names.

24 Q    As a pharmacist or a pharmacologist, you view

25 pentobarbital as basically a drug, a medication, correct?

1  A    From clinical applications, yes.  I know that my own

2  professional guidelines ask that we not refer to it as a

3  drug or medication.  They would prefer that we refer to it

4  as a chemical.

5  Q    As a chemical.  But it is intended for use in humans,

6  correct, or animals, as you said in the beginning?

7  A    Well, yes, from a -- for a clinical application to a

8  patient.  Yes, ma'am.

9  Q    And when you use *a clinical application,* you mean

10  for purposes of practicing medicine, correct?

11  A    That's correct.  To treat some sort of illness or

12  condition.  Yes.  Yes, ma'am.

13  Q    And so your concerns about sterility and potency

14  aren't tied to the fact that the substances are, in your

15  view, going to be used in the practice of medicine,

16  correct?

17  A    Yes, ma'am.  That's correct.

18  Q    If compounded pentobarbital is made correctly, it is

19  as efficacious as manufactured pentobarbital, is that

20  correct?

21  A    I am not aware of a head-to-head study that compares,

22  you know, the clinical efficacy of a compounded

23  formulation to the commercial product.

24  Q    You don't know?

25  A    I don't know.

1          MS. O'SHEA:  Okay.  I don't have any other questions.

2      THE COURT:  All right.

3          Ms. Peiffer, any redirect of the Doctor?

4      MS. PEIFFER:  Yes.  Several questions.

5      THE COURT:  All right.  Go right ahead then.

6                      **REDIRECT EXAMINATION**

7  BY MS. PEIFFER:

8  Q    Just to clarify, Dr. Ruble, if a drug has -- I'm

9  sorry, a compounded mixture has decreased in potency,

10 would it work as the product was intended to work?

11 A    It would depend on what that potency is.  There are

12 these guidelines and cut offs.  I mentioned 92%, according

13 to the USP monograph, or to 90% if it is according to 797.

14     There is a retention of some amount of active

15 pharmaceutical ingredients, but those cut offs or

16 guidelines is, I guess, concluded that it's not fit for

17 meeting its intended use.

18 Q    What do you mean not fit for intended use?

19 A    It doesn't have the potency to achieve the expected

20 or anticipated results of the application of it.

21 Q    Would that be true no matter how someone used the

22 drug?  Whether it was used as a medication, or for some

23 other reason?

24 A    Well, if we're using it in a clinical application to

25 treat a patient's illness, we would not use it if it were

1   expired or if it were beyond the beyond use date.  We

2   would not do that with a patient.

3   Q    Is there also a risk if it were not used for a

4   medical purpose to treat a patient, would a drug whose

5   potency decreased still potentially not work the way it's

6   intended?

7        MS. O'SHEA:  Well, Your Honor, I would object.  He

8   just testified that the intended use is for clinical

9   purposes.

10       THE COURT:  I think you have to rephrase your

11  question and focus it just a bit.

12       MS. PEIFFER:  Thank you.

13  BY MS. PEIFFER:

14  Q    If a drug is intended, for example, to render someone

15  unconscious, and it has degraded in potency beyond the

16  acceptable guidelines, is it a risk that that drug being

17  used that has degraded would not render a person

18  unconscious?

19  A    Well, we would expect that.  I don't know that I am

20  fully qualified to answer that question from that

21  standpoint in terms of the prescribing intent of the

22  prescriber.  I would just say that I would have some

23  concerns as a pharmacist whether or not that particular

24  product would have the API necessary to meet what the

25  physician's or the prescriber's order for therapy would

1   be.

2   Q     And based on your research and your experience in the

3   field, do you consider yourself able to discuss the

4   requirements, such as potency and sterility of compounded

5   substances, even substances you have not made yourself?

6        THE COURT:  For what purpose?

7        MS. PEIFFER:  To opine on the effectiveness, potency,

8   and sterility, and how the compounded substances work.

9        THE COURT:  For what purpose?

10       MS. PEIFFER:  I'm sorry, Your Honor.  I don't think I

11   understand what you're asking.

12       THE COURT:  You're talking about the potency of the

13   drug and its effectiveness, okay?

14       MS. PEIFFER:  Right.

15       THE COURT:  For what purpose?

16       MS. PEIFFER:  For any purpose.

17       THE COURT:  Okay.  For any purpose.

18       Do you understand the question, Dr. Ruble?

19       DR. RUBLE:  If I may ask, Ms. Peiffer, with the

20   Court's indulgence, to repeat the question just so I have

21   it clear what is being asked of me.

22       MS. PEIFFER:  Of course.  I don't know if I can say

23   it exactly.

24   BY MS. PEIFFER:

25   Q     But based on your professional experience, your

1   research, and the things that you have relied on for your

2   experience in the past 20 years, do you consider yourself

3   qualified to opine on issues like potency and sterility

4   and stability in compounded substances, even for

5   substances you have not made yourself and mixed yourself?

6   A     Well, I would hope so from the standpoint that I'm

7   educating the next generation of pharmacy professionals

8   who will be undertaking those activities in many

9   circumstances to provide those preparations in direct

10  patient care activities.  They've got to learn it from

11  somewhere.  One would hope that their instructor has the

12  requisite expertise, and I have to say that I do have that

13  to project to them.

14  Q     And one last question, Dr. Ruble.  You have been

15  given three documents to review, and this Court has

16  labeled them Exhibits 1, 2, and 3.  If you were given

17  those documents in your practice, and that was the only

18  information that you had about a particular mixture that

19  you were planning to use, would you think further

20  investigation is reasonable and necessary before using

21  that substance?

22        MS. O'SHEA:  Your Honor, I --

23        THE COURT:  Excuse me.

24        For what purpose?

25        MS. PEIFFER:  Again, for any purpose, Your Honor.

1      THE COURT:  Any purpose?

2      Very broad question, Doctor.

3      MS. PEIFFER:  For the purpose that the drug is

4   intended.

5      MS. O'SHEA:  I object as to relevance.

6      THE COURT:  Well, as presented, it's a bit on the

7   vague side.  I don't know whether it's relevant or not

8   until she is able to relate it.

9      Are we talking about a patient in surgery?  Or are we

10  talking about, frankly, an execution, as we have here?  I

11  mean, they are totally different purposes.  You're going

12  to have to narrow your question, and focus it a bit more

13  on the facts before the Court.

14     MS. PEIFFER:  Of course.

15     THE COURT:  Rephrase your question, and the Doctor

16  will answer.

17  BY MS. PEIFFER:

18  Q    Given the documents that you have reviewed, you saw

19  that you -- you opined earlier that there was no sterility

20  testing.  Would you have concerns about using that

21  substance if you were trying to render someone

22  unconscious?

23     THE COURT:  Objection is overruled.

24     Go ahead, Doctor.  You may answer.

25     DR. RUBLE:  Thank you, Your Honor.

1   A     The due diligence process on this is a clinical

2   judgment can manifest in different ways.   I would say that

3   as I educate my students in conducting their own due

4   diligence in determining these things, there are a number

5   of factors I would want to know.   I don't know the name of

6   the pharmacy in this case.   And obviously, I'm not asking

7   for that.   But the reputation of the provider who is

8   providing the preparation can go along with part of that

9   consideration.

10          Not knowing the recipe here, for me, many times in

11  understanding the compounded formulations, I would want to

12  know how it is prepared, what other ingredients may or may

13  not be in it.   We have that capability with commercial

14  products because they are identified in a package insert.

15  We don't necessarily have that with compounded

16  preparations.   So those would be a couple of the elements.

17          You mentioned sterility testing on there, too.   We

18  don't necessarily always have access to that information

19  as compounders, but we would like -- that would be part of

20  the basis of the reputation of the provider if they've had

21  previous products that have had issues or not.

22  Q     And concerning the beyond use date you mentioned

23  earlier, would you look into that further given only the

24  three documents that you have in front of you?

25  A     I would want to know more information about how that

 1  was ascertained.

 2       MS. PEIFFER:  Thank you.  No further questions.

 3       THE COURT:  All right.

 4       May the Doctor be excused at this point, so to speak?

 5       Ms. O'Shea?

 6       MS. O'SHEA:  Yes, Your Honor.

 7       THE COURT:  Ms. Peiffer?

 8       MS. PEIFFER:  Yes.

 9       THE COURT:  Dr. Ruble, that completes our

10  examination.  Thank you so much for your valuable time.

11  We appreciate it very much, sir.

12       DR. RUBLE:  Thank you, Your Honor.  Good day, sir.

13       THE COURT:  Yes, sir.  You're excused, and free to

14  go.

15                    **WITNESS STOOD ASIDE**

16       THE COURT:  Next witness, Ms. Peiffer.

17       MS. PEIFFER:  No further witnesses.

18       THE COURT:  All right.

19       Ms. O'Shea, do you have evidence you want to put on

20  this afternoon?

21       MS. O'SHEA:  We do, Your Honor.  We have two

22  witnesses to testify by telephone.

23       If we would get Mr. Robinson.  His phone number is

24  the one that begins with area code 75 --

25       THE COURT:  Why don't you come up to the Clerk's desk

1   to make sure Ms. Pizzini dials the right number, okay?

2        MS. O'SHEA:  Of course.

3        THE COURT:  All right.  Thank you.

4        All right, Mr. Robinson, my name is Henry Hudson.

5   I'm the United States District Judge trying this case

6   today.  Before Ms. O'Shea asks you questions, I'm going to

7   ask our Clerk of the Court, Ms. Pizzini, to administer the

8   oath.

9        Ms. Pizzini, if you would.

10        THE CLERK:  You do solemnly swear that the testimony

11   which you are about to give, in this case, before this

12   Court, shall be the truth, the whole truth, and nothing

13   but the truth, so help you God?

14        MR. ROBINSON:  I do.

15        THE COURT:  You may inquire.

16        Whereupon, **Arnold D. Robinson**, having been

17   duly sworn in, testifies as follows:

18                    **DIRECT EXAMINATION**

19   BY MS. O'SHEA:

20   Q    Mr. Robinson, would you state your full name for the

21   Court, please.

22   A    My name is Arnold David Robinson.

23   Q    You're currently employed by the Virginia Department

24   of Corrections as its Chief Operating Officer.

25   A    Yes.  I am employed as the Chief of Corrections

DIRECT EXAMINATION OF ARNOLD ROBINSON

1  Operations for the Virginia Department of Corrections.

2  Q    I misstated your title a little bit.  I apologize.

3      What do you do as the Chief of Operations, briefly?

4  A    I am responsible for all operational matters under

5  the facilities within the Commonwealth, and all probation

6  and parole districts in the Commonwealth of Virginia.

7  Q    Do executions generally within the department fall

8  within your auspices?

9  A    Yes, they do.

10  Q    I'm going to turn your attention now to a specific

11  inmate by the name of Alfredo Prieto.  Is he an inmate

12  within the Virginia Department of Corrections?

13  A    Yes.  He is an inmate in the Virginia Department of

14  Corrections.

15  Q    And he is currently facing execution, is that

16  correct?

17  A    Yes, he is currently facing execution.

18  Q    At some point, did you learn that Mr. Prieto's

19  execution had been eminent such that he had almost

20  exhausted his criminal habeas appeals, and a circuit court

21  order setting a date of execution would be forthcoming

22  soon?

23  A    Yes.  Somewhere around August I became aware of that.

24  Q    At the time that you learned Mr. Prieto was nearing

25  his execution date, did you have any concerns with respect

1  to whether or not the Commonwealth of Virginia would be

2  able to execute him if we were to execute him by lethal

3  injection?

4  A    Yes.  I became concerned about that during August

5  when we found out of a possible date being established for

6  him.  And at that time, I had a conversation between the

7  director and I.

8  Q    Why were you concerned if he were to be executed

9  after September 30th?

10  A    Because we knew that on October 1, 2015, that the

11  drug that we had, midazolam, would expire on September the

12  30th.

13  Q    The midazolam that you referenced, that is the drug

14  that Virginia uses as the first step of its 3-drug

15  protocol?

16  A    Yes.  Midazolam would be the first drug that we would

17  use in the 3-drug protocol.

18  Q    After that midazolam expired, did we have any other

19  drugs within the Virginia Department of Corrections that

20  we could use for the first step of that 3-drug protocol?

21  A    Can you repeat that.

22  Q    After that midazolam expired, did we have anything

23  else that we could use that was approved for use as the

24  first drug in Virginia's 3-drug protocol?

25       THE COURT:  When you say --

1   A     No, we do not.

2         THE COURT:  Excuse me, Mr. Robinson.

3         When you say "we," you're referring to the Virginia

4   Department of Corrections, correct?

5         MS. O'SHEA:  I am.  Yes.  Thank you.

6         THE COURT:  Okay.

7         Mr. Robinson, you may answer.

8   A     No, we would not have any drug available for the

9   first drug in the 3-drug protocol after September 30,

10  2015.

11  BY MS. O'SHEA:

12  Q     You referenced midazolam.  Are there other substances

13  that have been approved by the Virginia Department of

14  Corrections to use?

15  A     Yes.  We have three drugs that's approved for the

16  first in the 3-drug protocol.  One of those drugs is

17  thiopental, and pentobarbital is the second drug, and the

18  midazolam would be the third drug.

19  Q     My understanding is that sodium thiopental was the

20  original drug in the 3-drug protocol, is that correct?

21  A     That is correct.

22  Q     And pentobarbital was subsequently approved.  Do you

23  know when that was?

24  A     It was, I believe, 2011 or '12.  But I'm not 100%

25  sure on that.

1  Q     And then midazolam was the most recent approval.  And

2  that would have been sometime in 2014?

3  A     Yes.  That's correct.

4  Q     Turning now back to your concerns about Mr. Prieto's

5  execution.  When you determined that the Virginia

6  Department of Corrections did not, or would not have, a

7  needed substance for his lethal injection, what did you

8  do?

9  A     After a conversation between the director and I, I

10 contacted the Texas Department of Criminal Justice

11 service, a service which is in the Department of

12 Corrections in Texas, because I know that we had given

13 them in, I believe 2013, pentobarbital.  And I was -- and

14 I knew that they were using that drug in their execution

15 protocol in Texas.

16 Q     Who did you reach out to within the Texas Department

17 of Criminal Justice services?

18 A     I contacted the individual in the same level within

19 the Department of Corrections in Texas that I am here in

20 Virginia.  Their number two -- their number two person in

21 charge of the agency.

22 Q     Is this someone that you are familiar with or had

23 known before?

24 A     I have -- I've known him for several years through

25 contacts at national organizations that we go to in --

1   part of training that we've been to together.

2   Q    What did you discuss with the second in command at

3   the Virginia -- excuse me, the Texas Department of

4   Criminal Justice services?

5   A    I explained to him our situation.  And if it would be

6   possible that we could obtain from them the pentobarbital

7   that they're using in the Department of Corrections in

8   Texas for executions.

9   Q    And ultimately, did Texas agree to provide Virginia

10  with pentobarbital?

11  A    Yes, they did.

12  Q    During the course of your conversations with the

13  Texas official, were there any discussions regarding the

14  source or composition of the pentobarbital?

15  A    In the conversations with him, he advised that -

16       MR. LEE:  Objection, Your Honor.

17  A    - the drug was a compounded drug.

18       THE COURT:  Mr. Robinson, hold off, sir.

19       MR. ROBINSON:  Yes, sir.

20       THE COURT:  Mr. Lee.

21       MR. LEE:  That's hearsay, Your Honor.  He can't

22  testify to representations.

23       MR. ROBINSON:  I can barely hear.

24       THE COURT:  Hold on.  Hold on, Mr. Robinson.  Just

25  one second.  We'll be right back to you, sir.

1          Mr. Lee, I believe what he was testifying to is why

2   he took a certain act, and not for the truth of the

3   matter.   If that is the way the question is being asked,

4   I'll overrule it; otherwise, I'll sustain the objection.

5          MR. LEE:   Your Honor, I heard him begin to say this

6   person said, and then that's when I objected.

7          THE COURT:   All right.

8          Why don't you rephrase the question.   I'll sustain

9   Mr. Lee's objection.   Why don't your rephrase the question

10  so that it's foundational and not offered for the truth of

11  the matter, okay?

12         MS. O'SHEA:   Absolutely, Judge.

13         THE COURT:   Go ahead.

14  BY MS. O'SHEA:

15  Q    Mr. Robinson, did you inquire into the source or

16  composition of the pentobarbital that Texas was offering

17  to provide to Virginia?

18  A    Yes.   In conversation with the number two person in

19  Texas, I --

20         THE COURT:   Mr. Robinson, I think she only asked for

21  a yes or no answer.

22  A    Yes.

23         THE COURT:   Yes.   Next question.

24  BY MS. O'SHEA:

25  Q    What did you ask?

```
 1   A     In the conversation, he advised that --

 2         MR. LEE:  Objection, Your Honor.

 3         THE COURT:  Hold on, Mr. Robinson.

 4         Mr. Lee, in the interest of shortness of life, I'm

 5   going to let it in, and we can argue whatever value it

 6   has.  Let's just proceed with it.

 7         Go ahead, Mr. Robinson.

 8   A     He advised me that the pentobarbital that they use in

 9   the executions in Texas -- advised me that it has been

10   compounded in Texas.  And that he had a certificate that

11   verified the validity of the drug, and that they had used

12   it in the previous executions in Texas.

13         THE COURT:  I'm only going to accept that as a

14   preface of how you received the drug, not for the truth of

15   the matter, okay?

16         MS. O'SHEA:  Absolutely, Judge.

17         THE COURT:  All right.  Go right ahead.  Next

18   question.

19   BY MS. O'SHEA:

20   Q     Based on the representations from the Texas official,

21   did Virginia at that time decide that they wanted to

22   acquire the pentobarbital from Texas?

23   A     Yes, we did.

24   Q     Who -- or how did you decide to go and get the

25   pentobarbital from Texas?  How did you decide for it to be
```

1   delivered here?

2   A    We decided that we would send two individuals to

3   Texas via car to pick up the drugs and return them to

4   Virginia.   Similar to how Texas picked up the drugs in

5   2013 from us.

6   Q    Who did you select to go to Texas?

7   A    I selected Carlos Hernandez, who is the individual in

8   Virginia who has carried the drugs between our pharmacy in

9   Greensville for many years, and had received training from

10  our pharmacist on how to transport those drugs.   So just

11  pretty much on-the-job training for the last 12 years.

12  Q    So, to your knowledge, Mr. Hernandez when to Texas

13  and returned with the pentobarbital, is that correct?

14  A    That is correct.

15  Q    Do you have personal knowledge of what Mr. Hernandez

16  did with the pentobarbital upon his return to Virginia?

17  A    Upon his return to Virginia -- he came back on

18  Thursday.   I'm not familiar with the specific date.   He

19  arrived, our pharmacist met him.   We secured it that night

20  in the pharmacy here at our headquarters at the Virginia

21  Department of Corrections.

22  Q    So when you say he met with *our pharmacist,* you're

23  speaking of the pharmacist for the Virginia Department of

24  Corrections?

25  A    Excuse me?

1  Q    When you said *"our pharmacist,"* did you mean the

2  pharmacist for the Virginia Department of Corrections?

3  A    Yes.  The pharmacist for the Virginia Department of

4  Corrections.

5  Q    What happened to the pentobarbital after it was

6  secured at the headquarters?

7  A    Once it was secured at the headquarters, it was

8  secured in their pharmacy area behind lock and key.  That

9  room has one door that enters the room, plus it is alarmed

10  through an alarm company, and is monitored by a security

11  guard at our front desk.  It also has a motion monitor in

12  the area.

13      It was secured at that time, and remained there until

14  picked up by Greensville Correctional Center employees

15  that have been trained to carry that drug back to

16  Greensville.

17  Q    During the course of your conversations with Texas,

18  did you write anything down in the forms of

19  correspondence, or memorandum, or contracts, or anything

20  along those lines?

21  A    No, I did not.

22  Q    To your knowledge, did anybody else with the Virginia

23  Department of Corrections write anything down?

24  A    Not to my knowledge.  No.

25  Q    Why not?

1   A     The conversation that I had --

2         THE COURT:  Hold on.  Hold on.

3         MR. ROBINSON:  All right.

4         THE COURT:  I think the objection has got to be

5   sustained to that.  He's going to testify as to what

6   someone explained to him in the State of Texas.  It is

7   hearsay.  Inadmissible.  Objection is sustained.

8         Next question.

9         MS. O'SHEA:  Yes, Your Honor.

10  BY MS. O'SHEA:

11  Q     Why did you not write anything down, Mr. Robinson?

12  A     Because after talking with my counterpart in Texas, I

13  was confident that what he was sending me was

14  pentobarbital.  And I had no need to because of our

15  professional relationship.

16  Q     During the course of your conversation with Texas,

17  you learned that the pentobarbital was compounded, I

18  believe you testified to that earlier, is that correct?

19  A     That is correct.

20  Q     To your knowledge, has compounded pentobarbital been

21  used in an execution in Virginia?

22  A     Not to my knowledge.  No.

23  Q     The fact that this was compounded as opposed to

24  manufactured pentobarbital, did that raise any concerns

25  with you?

1   A    No, it did not.

2   Q    Why not?

3   A    Because I understand from Texas that it's been used

4   24 times, 15 this year.  And also, I was provided with --

5   the Attorney General's office was provided with a

6   certificate showing the certification that it was

7   pentobarbital.

8   Q    Thank you, Mr. Robinson.  I'm going to ask you just a

9   couple more questions now, and these are specific to

10  Virginia's execution protocol.

11       You testified earlier that pentobarbital is the first

12  drug that is administered in the Virginia 3-drug protocol,

13  is that correct?

14  A    That is correct.

15  Q    And what is your understanding of the reason that

16  this first drug is administered?  What is it supposed to

17  do?

18  A    That drug sedates the individual and puts them in an

19  unconscious state.

20  Q    After the first drug is administered --

21  intravenously, correct?  It's administered intravenously?

22  A    That's correct.

23  Q    After the first drug is administered according to

24  Virginia's execution protocol, is anything done within the

25  execution chamber to ascertain whether or not the sedative

1 has taken effect?

2 A    Yes, there is.

3 Q    What is that?

4 A    After the -- after the first drug is administered,

5 there is a saline solution that is also pushed behind that

6 drug.  In approximately two minutes, then we have what we

7 call a noxious test that we test to determine the

8 consciousness of the individual.  And that is by

9 pitching -- that is by pinching the individual's right or

10 left foot depending on the individual who does that.  But

11 we're trained to do that.

12 Q    So there's an individual in the execution chamber who

13 is trained to pinch the foot of the inmate to determine

14 whether or not the first drug has taken effect?

15 A    That's correct.

16 Q    According to Virginia's execution protocol, if the

17 sedative has not taken effect, what happens next?

18 A    Then we will repeat that process.

19      MS. O'SHEA:  If I could have just a second, Your

20 Honor.

21      THE COURT:  Yes, ma'am.

22      MS. O'SHEA:  I have no other questions at this time,

23 Mr. Robinson, but Mr. Prieto's counsel likely do.  Thank

24 you.

25      THE COURT:  Mr. Lee.

1    **CROSS-EXAMINATION**

2    BY MR. LEE:

3    Q    Chief Robinson, this is Rob Lee.

4    A    Yes, sir.

5    Q    Thank you for your testimony today.  We'll just start

6    with something that you had just said.  You said you would

7    repeat the process.  What is the process that you would

8    repeat?

9    A    He would re-administer a second dose of the

10   pentobarbital.

11   Q    Okay.  And correct me if I'm wrong, but I heard your

12   testimony before to be that the decision of the Department

13   of Corrections to use compounded pentobarbital in

14   executions was based on your telephone conversation with

15   your counterpart with the Texas Department of Criminal

16   Justice, and the provision of a laboratory report that is

17   before this Court as Exhibit 1?

18   A    Can you ask that question again, Mr. Lee?

19   Q    Yes.  I understood your testimony before to be that

20   the decision to use compounded pentobarbital from the

21   Texas Department of Corrections was based on your

22   telephone conversation with your counterpart in Texas, and

23   the lab report that they provided, which is before this

24   Court as Exhibit 1?

25        THE COURT:  I don't know that he could identity

1   Exhibit 1.  I doubt he's seen that.

2        MR. LEE:  Well, okay.

3   BY MR. LEE:

4   Q    You said that there was -- that the person you spoke

5   with was going to provide a lab report, a certificate.

6   A    The person advised me that if there was questions

7   concerning the validity of the pentobarbital, that they

8   would provide certification of such.  And we asked for

9   that.  And that was sent to the Attorney General's office.

10        MR. LEE:  And, Ms. O'Shea, will you acknowledge that

11   that's Exhibit 1, that document?

12        MS. O'SHEA:  Actually, I believe the document is

13   Exhibit Number 3.

14        MR. LEE:  Okay.  I'm sorry.  Number 3.  And Exhibit 1

15   was the photograph.

16   BY MR. LEE:

17   Q    Thank you, Mr. Robinson.

18        So nothing else was done, is that correct?

19   A    When you say *nothing else was done,"* from the

20   standpoint of our agency doing anything with that?

21   Q    No.  I'm sorry.  Let me be more precise.  There was

22   no additional independent research that went into making

23   this decision?

24   A    Independent research.  No, sir.

25   Q    Okay.  There was no consultation with experts?

1  A    No, sir.

2       THE COURT:  You're talking about to determine the

3  efficacy of the compound he received?

4       MR. LEE:  Yes.  And the decision.

5       THE COURT:  And the decision.  Okay.  Go ahead.

6  BY MR. LEE:

7  Q    Mr. Robinson, can you tell us the difference between

8  compounded pentobarbital, and F.D.A. approved

9  pentobarbital?

10 A    No, I cannot.

11 Q    Are you aware of the difference between Texas'

12 execution protocol and Virginia's execution protocol?

13 A    I'm familiar with the Texas protocol.  Correct.

14 Q    Can you just describe it, briefly.

15 A    They just use the one drug, pentobarbital.

16 Q    And are you aware of the approximate length of time

17 in Texas executions for the 1-drug pentobarbital and

18 protocol?

19 A    No.  I'm not familiar with the length of time.  I

20 know that in conversation with my counterpart, that's the

21 drug that they use in Texas for executions.  And it's a

22 single drug protocol.  And I know that he advised that

23 they had used it 24 times, and that it was a compounded

24 drug.

25      MR. LEE:  I don't have anymore question.

1        THE COURT:  Any redirect, Ms. O'Shea?

2        MS. O'SHEA:  Briefly.

3                    **REDIRECT EXAMINATION**

4  BY MS. O'SHEA:

5  Q    Mr. Robinson, do you know whether any other

6  jurisdictions use compounded pentobarbital as a part of

7  their execution protocol?

8  A    No, I do not know other than Texas.

9  Q    If when you were speaking with Texas, if they had

10 been unable to provide you with assurances regarding the

11 pentobarbital, the fact that it had been tested, that it

12 was what it claimed to be, would you have accepted it from

13 Texas anyways?

14 A    No, we would not have.

15       MS. O'SHEA:  I have no further questions.

16       THE COURT:  May Mr. Robinson be excused?

17       MR. LEE:  Can I have a brief follow-up?  Never mind,

18 Your Honor.

19       THE COURT:  All right.

20       Mr. Robinson, thank you very much for your testimony

21 today.  That completes the examination.  We thank you for

22 your time, sir.

23       MR. ROBINSON:  Thank you, Your Honor.

24       THE COURT:  Yes, sir.  Thank you.

25                    **WITNESS STOOD ASIDE**

1        MS. O'SHEA:  I have one other witness.

2        THE COURT:  Yes, ma'am.  Who is your next witness?

3        MS. O'SHEA:  His name is Carlos Hernandez.

4        THE COURT:  Carlos Hernandez.

5      Mr. Hernandez, my name is Henry Hudson.  I'm the

6  United States District Judge trying this case today.

7        MR. HERNANDEZ:  Yes, sir.

8        THE COURT:  And before you're questioned by

9  Ms. O'Shea, I'm going to have our Clerk of the Court

10 administer the oath to you, okay, sir?

11       MR. HERNANDEZ:  Yes.

12       THE COURT:  Go right ahead, Ms. Pizzini.

13       THE CLERK:  You do solemnly swear that the answers to

14 the questions which you are about to be asked shall be the

15 truth, the whole truth, and nothing but the truth, so help

16 you God?

17       MR. HERNANDEZ:  Yes, ma'am.

18       THE COURT:  All right, Ms. O'Shea.  Go right ahead.

19       MS. O'SHEA:  Thank you.

20        Whereupon, **Carlos A. Hernandez**, having been

21 duly sworn in, testifies as follows:

22                    **DIRECT EXAMINATION**

23 BY MS. O'SHEA:

24 Q    Sir, would you state your full name for the Court,

25 please.

1   A    Carlos Alberto Hernandez.

2   Q    You're currently employed be the Virginia Department

3   of Corrections?

4   A    Yes, ma'am.

5   Q    In what capacity?

6   A    I am the Administrator of Special Operations.

7   Q    How long have you been with the department?

8   A    Twenty-eight years, ma'am.

9   Q    It is my understanding that you have been trained

10  within the department to handle drugs or pharmaceutical

11  substances, is that correct?

12  A    It was on-the-job training.  Yes, ma'am.

13  Q    As a part of your duties, do you transport drugs that

14  are to be used in an execution?

15  A    Yes, ma'am.

16  Q    How many years have you been doing that?

17  A    Twelve years, ma'am.

18  Q    At some point in August of 2015, were you asked to go

19  to Texas to secure a supply of lethal injection drugs?

20  A    Yes, ma'am.

21  Q    How -- how did this come to your attention?  How were

22  you asked to go?

23  A    I received a phone call from my supervisor.  And I

24  was informed that I would be taking a trip to Texas.

25  Q    Did you in fact go to Texas?

1   A    Yes, ma'am.

2   Q    Where specifically did you go?

3   A    Huntsville.

4   Q    Huntsville, Texas?

5   A    Yes, ma'am.

6   Q    What did you do when you got there?

7   A    Picked up three vials.

8   Q    Where did you get them from?

9   A    The facility.  The Huntsville facility.

10  Q    Is that a Texas --

11  A    A correctional facility.

12  Q    A Texas correctional facility in Huntsville?

13  A    Yes, ma'am.

14  Q    When you arrived at the facility, who, if anyone, did

15  you interact with?

16  A    It was one of the administrative staff.

17  Q    One of the administrative staff.  And you testified a

18  second ago that three vials of drugs came into your

19  possession?

20  A    Yes, ma'am.

21       THE COURT:  Hold on just one second.

22       Ms. Peiffer, I've read over all the pleadings.  Is

23  this really an issue in this, what Mr. Hernandez did?

24       MS. PEIFFER:  Your Honor, I believe the issue is

25  about the conditions of the substance, this very fragile,

1  delicate substance.

2      THE COURT:  Okay.  I'll go ahead and go through it.

3  That's fine.  I just didn't detect it in your brief, but

4  go ahead.

5  BY MS. O'SHEA:

6  Q    Three vials of a substance labeled as pentobarbital

7  were brought into your possession, is that correct?

8  A    Yes, ma'am.

9  Q    Did you receive instructions, or ask for

10 instructions, with regard to how to handle this particular

11 substance?

12 A    Yes, ma'am.

13 Q    From whom?

14 A    The person that issued me the drugs.

15 Q    What were you told with respect to how to handle or

16 store the pentobarbital?

17 A    I was told to keep them at room between 60 and

18 80 degrees, ma'am.

19 Q    And specifically, how were the drugs packaged when

20 they were given to you?

21 A    They were in three vials that were in a cardboard box

22 with bubble wrap on the bottom of the box.

23 Q    Three vials inside a box, is that what you just said?

24 A    Yes, ma'am.

25 Q    What type of box was it?

1   A     It was a cardboard box.

2   Q     Cardboard box.  Did it have a lid?

3   A     Yes, ma'am.

4   Q     Okay.  So could sunlight penetrate into the cardboard

5   box?

6   A     No, ma'am.

7   Q     At the time that you picked up the three vials of

8   pentobarbital, did you execute any paperwork?

9   A     Yes.

10  Q     What did you execute?

11  A     I believe it was a DEA Form 222.

12  Q     A DEA Form 222?

13  A     Yes, ma'am.

14  Q     To your knowledge, what is the purpose of executing

15  that form?

16  A     I'm sorry?

17  Q     What is the purpose of filling out that form?

18  A     Well, to make sure that there's a chain of custody.

19  Q     So to legally transfer custody from Texas to

20  Virginia?

21  A     Yes, ma'am.

22  Q     After you picked up the three vials of pentobarbital

23  in the box from the Huntsville facility, what did you do

24  with them?

25  A     There were placed inside an ammo box, a plastic ammo

1  box, and locked.

2  Q    What is a plastic ammo box?  Would you describe it,

3  please.

4  A    It's a plastic ammo -- a plastic box with a hinged

5  lid that is locked.

6  Q    After you placed it in the box, what did you do with

7  it next?

8  A    Kept it in my possession.

9  Q    When you say kept it in your possession, where did

10  you put it?

11  A    Well, from the facility it was in the vehicle with

12  me.  When I got to the hotel room, it went up to the hotel

13  room with me.  From there, it came back to the Virginia

14  Department of Corrections pharmacy.

15  Q    And when you brought it back to Virginia, it was in

16  your car?

17  A    Yes, ma'am.

18  Q    Which part of your car?

19  A    The back seat.

20  Q    As you were driving the pentobarbital back to

21  Virginia, what, if anything, did you do to ensure that it

22  had not gotten too hot or too cold?

23  A    I kept feeling it with the back of my hand.

24  Q    What did you do with the pentobarbital when you

25  arrived in Virginia?

1  A    Took it up to the pharmacist.  It was about 9:00

2  a.m. -- 9:00 p.m.  Took it to the pharmacist.  He opened

3  the box, and accounted for the three vials.

4      MS. O'SHEA:  All right.  Thank you, Mr. Hernandez.  I

5  don't have any other questions at this time, but

6  Mr. Prieto's counsel might.

7      THE COURT:  All right.

8      Mr. Lee.

9                    **CROSS-EXAMINATION**

10 BY MR. LEE:

11 Q    Mr. Hernandez, my name is Rob Lee.  I'm going to ask

12 you a few questions about what you were just talking about

13 with Ms. O'Shea.

14 A    Yes, sir.

15 Q    You say that you had on-the-job training in the

16 transport and storage of chemicals used in executions, is

17 that correct?

18 A    Yes, sir.

19 Q    Can you briefly describe what on-the-job training

20 means, just briefly?

21 A    I was -- I was taken to -- from the pharmacy down to

22 our facility where we conduct our executions.  The box is

23 unlocked.  Everything is accounted for at the pharmacy.

24 The box is then locked.

25      We take it down to the facility.  It is opened by the

1   facility.  I do not have a key.  We recount it.  The form

2   is completed.  I get a copy and they keep a copy.

3   Q    Okay.  Thank you.

4        Now, you testified that you traveled to Texas in

5   August of 2015?

6   A    Yes, sir.

7   Q    Did you travel as a D.O.C. employee?

8   A    Yes, sir.

9   Q    And it sounds like you drove.  Am I correct?

10  A    That's correct.

11  Q    Did you drive a D.O.C. vehicle?

12  A    Yes, sir.

13  Q    Is that -- did you document checking out the vehicle

14  at all?

15  A    No.  It's a vehicle that is assigned to me, sir.

16  Q    I'm sorry.  I couldn't hear you.

17       THE COURT:  He said it was a vehicle assigned to him.

18       MR. LEE:  Okay.

19  BY MR. LEE:

20  Q    Now, you said that you essentially maintained a chain

21  of custody of the bottles?

22  A    That is correct.

23  Q    And how did you do that?

24  A    It never left my possession.

25  Q    So who did you receive the chemicals from?

1   A    Again, it was one of the administrative officials

2   from Texas.

3   Q    But you don't know the person's name?

4   A    No, sir.

5   Q    You didn't record the person's name?

6   A    I have it in my office.  I'm not at the office right

7   now, sir.

8   Q    I'm sorry.  I'm not trying to confront you about

9   that, Mr. Hernandez.

10  A    That's fine.

11  Q    I just wanted to know whether you had any -- you

12  documented that chain of custody, or it's just in your

13  head?

14  A    I have the gentleman's name in my office.  I have his

15  business card.

16  Q    When he transferred custody to you though, was there

17  any document created?

18  A    Yes.  The DEA 222.

19  Q    And his name is on that?

20  A    Yes, sir.

21  Q    Okay.  Did you document in any way transporting the

22  materials?

23  A    No, sir.

24  Q    And you said that you then turned them over to

25  someone else?

1   A      Yes, sir.  The pharmacist.

2   Q      And is there any record of that?

3   A      Yes.

4   Q      And can you describe that record?

5   A      It's on the same DEA 222.

6   Q      It has a date of the -- the date and time of

7   transfer?

8   A      Yes.

9   Q      You also said that when you received the drugs, you

10  were instructed to maintain them at room temperature?

11  A      Yes.

12  Q      And you've stored the drugs now since obtaining them

13  at room temperature as well, is that correct?

14  A      From the time I received them until the time I

15  delivered them.  Yes, sir.

16  Q      And when you delivered them -- I'm sorry, but you

17  said you were trained in the transport and storage of

18  drugs.  Are they stored at room temperature as well?

19  A      Not stored, sir.  I'm transporting them.

20  Q      So in terms of chain of custody, you don't know how

21  the drugs were stored or maintained after you -- before

22  you got them or after you released them?

23  A      I do not.

24  Q      When you have transported drugs before for the

25  department, have they been received -- have you also been

1    instructed to maintain them at room temperature?

2    A    They have been packaged at the pharmacy.  So I have

3    not been instructed to keep them at room temperature.

4    Normally, my trip is no longer than about an hour.

5         MR. LEE:  Can I have one second, Your Honor?

6         THE COURT:  Yes, sir.

7         MR. LEE:  That's it, Your Honor.  Thank you.

8         THE COURT:  Okay.  Yes, sir.

9         Ms. O'Shea.

10        MS. O'SHEA:  If I could just -- the DEA Form 222 that

11   we've been discussing is the document previously admitted

12   as Plaintiff's Exhibit 2, is that correct, Mr. Lee?

13        MR. LEE:  Yes.

14        MS. O'SHEA:  Okay.  I just wanted to make that clear

15   on the record that the document we discussed is

16   Plaintiff's Exhibit 2.

17        THE COURT:  Appreciate your clarification.

18        MS. O'SHEA:  Thank you.

19        THE COURT:  Any redirect?

20        MS. O'SHEA:  No, sir.

21        THE COURT:  All right.

22        Mr. Hernandez, that completes the examination today.

23   Thank you very, very much for your time.  We appreciate

24   your testimony.

25        MR. HERNANDEZ:  Yes, sir.

1      THE COURT:  You're excused and free to go.

2      MR. HERNANDEZ:  Thank you, sir.

3                    **WITNESS STOOD ASIDE**

4      THE COURT:  All right.  I'll hear final comments from

5  each side.

6      You're the movant.  Go right ahead, Ms. Peiffer.

7      MS. PEIFFER:  Thank you, Your Honor.  I'll try to

8  keep this brief.

9      I think that the standard here that Mr. Prieto shows

10  a likelihood of success on the merits that he can show a

11  substantial risk of harm if the Department of Corrections

12  proceeds with his execution using this compounded

13  pentobarbital without really any due diligence or research

14  or sufficient investigation, that he would suffer cruel

15  and unusual punishment that would violate the Eighth

16  Amendment.

17      There are a couple of points --

18      THE COURT:  The possibility is not the standard

19  though.  I think you're going to have to show that there's

20  a substantial risk of injury, which is more than a

21  speculative possibility in a high-abstract zone.  This is

22  very, very specific.  So point to that as you argue your

23  case, okay?  Make sure you identify that for me.

24      MS. PEIFFER:  Yes, sir.

25      THE COURT:  Okay.  Go ahead.

1    MS. PEIFFER:  So there are a couple of points that I

2 want to touch on that support the argument that there is a

3 likelihood of success on the merits that he has shown a

4 substantial risk of harm.

5    First of all, the protocol in Virginia is unique in

6 terms of using a 3-drug protocol, trying to use a

7 compounded pentobarbital as the first drug.  And that is

8 why it is distinguished from Texas.  I addressed this

9 earlier.  But drugs that are sufficient for use in Texas,

10 or that Texas assures might be sufficient for an execution

11 there, don't automatically translate to use in Virginia.

12 Virginia has --

13    THE COURT:  Well, I understand that.  But in Texas,

14 they use strictly pentobarbital, do they not?

15    MS. PEIFFER:  That is correct.  To my understanding.

16    THE COURT:  So if the compound from Texas is

17 high-risk, wouldn't the fact that it's been used on 24

18 other occasions, 15 times this year, wouldn't that be

19 probative?  The same drug.

20    MS. PEIFFER:  I'm actually glad that you brought that

21 up, Your Honor.  That was a later point in my argument.

22    THE COURT:  All right.

23    MS. PEIFFER:  And I think that statement demonstrates

24 that the Department of Corrections doesn't understand

25 compounded pentobarbital.  It doesn't understand how it's

1  different from manufactured pentobarbital.

2       The statement that it was used over the past two

3  years in 24 executions -- for at least 24 executions,

4  shows a misunderstanding that compounded pentobarbital is

5  not one category.  It is variable, and it depends on the

6  specific batches.

7       So as you heard from Dr. Ruble, every batch of

8  compounded pentobarbital is different.  And then the

9  product changes based on the conditions in which it's

10 kept, the conditions in which it's stored, the things that

11 it's exposed to.  So the claim that Texas has been using

12 this chemical for the past two years is incorrect.  This

13 batch of pentobarbital, according to the documents we

14 received, was only made in April of 2015.

15      THE COURT:  Well, I don't know that he testified that

16 it was exactly the same batch.  The evidence is unclear on

17 that.  But he did say it was compounded pentobarbital.

18      MS. PEIFFER:  That's correct.

19      THE COURT:  Okay.

20      MS. PEIFFER:  And the point that I'm trying to make,

21 and I apologize for not being clear -

22      THE COURT:  That's okay.

23      MS. PEIFFER:  - is that compounded pentobarbital is

24 not the same from batch to batch.  There is a variability.

25 And that's part of the reason that testing is so

1  significant in the compounding field because every batch

2  is different.  There's a reason that it's not the same as

3  manufactured pentobarbital, which has different -- can be

4  kept in different conditions, it is much more stable, and

5  there's much less concern because it's made in

6  professional ways, and regulated by the F.D.A.

7       So lumping all compounded pentobarbital into one

8  category is just not sufficient.  And that's why, in this

9  particular case with this particular chemical, it's so

10  significant that due diligence and investigation be done

11  into the product.

12       You've heard Mr. Robinson's testimony that basically

13  he said after talking with his counterpart, that he felt

14  no need to look further due to a professional

15  relationship.  He felt no need to investigate these

16  materials that were going to be used to put someone to

17  death.

18       And when listening to Dr. Ruble's testimony --

19       THE COURT:  I don't mean to interrupt you.

20       But in fact he did.  He made sure that there was a

21  lab test that said it was 94.5% pentobarbital.

22       MS. PEIFFER:  There was a lab test.  That's correct.

23  I think there's some issues with the lab test that he did

24  not address, and was not able to address.  As Dr. Ruble

25  testified, the lab test says nothing about sterility.

1 Sterility testing is required, particularly if they're

2 going to attempt to assign an extended beyond use date.

3 That's absolutely required.

4      So we're left with a lot of questions about whether

5 this -- the proper testing wasn't done, whether Virginia

6 didn't inquire into the proper testing.  But they should

7 have known if they had done their research and done their

8 investigation about this chemical if they're going to try

9 to use this as part of the 3-drug protocol.  They should

10 have come to understand enough that investigation would

11 need to be done.  That it's unusual to have a beyond use

12 date of one year.

13      And to be able to set that beyond use date, there has

14 to be extensive sterility testing.  And none of the

15 documentation that we received shows any indication that

16 there was any sterility testing, let alone, I think, that

17 would allow for a one year use by date.

18      As we heard from Dr. Ruble, usually without that

19 sterility testing, if the material were refrigerated, the

20 beyond use date would be three days.  That is 72 hours.

21 And in this case, we're going on six months after it was

22 made.

23      And we have heard nothing about the conditions of how

24 it was made and why sterility testing would justify this

25 excessive beyond use date.  So that in and of itself, I

1  think, raises substantial questions.  And I think they

2  should have done some investigation, and looked into this

3  to see if this mixture really is sufficient to use as

4  compounded pentobarbital as the first chemical of the

5  lethal injection protocol.

6      I think there are other issues with the testing which

7  we heard about today.  You mentioned potency earlier.  And

8  there is a potency test in that material.  The potency is

9  at the low end of the range right after it's manufactured.

10 We don't know what the potency is today.  The potency in

11 April of 2015 could have degraded substantially by this

12 point in October.  And one of the reasons that's possible

13 is because, you know, a beyond use date typically would be

14 much shorter than the five to six month period.

15     We've heard a little bit about the conditions of

16 storage.  Mr. Robinson's testimony seemed to focus

17 primarily on security.  We did hear that when it was

18 transported, it was kept, according to the testimony, in a

19 60- to 80-degree temperature range, which according to

20 Dr. Ruble's expert testimony, is not the way that

21 compounded pentobarbital should be kept.  He testified

22 that in order to extend the life and extend the potency

23 and to make sure it doesn't degrade, it should be

24 refrigerated.  And 60 to 80 degrees is not equivalent to

25 cold temperature or refrigeration.  So that also raises

1  questions.

2       And again, we didn't have access to that information

3  before, so it is not in the pleadings.  We had repeatedly

4  asked for information about how things were transported,

5  and the conditions in which they were transported and

6  stored, and this hearing today to is the first time we've

7  received that information.

8       Sterility -- so potency, sterility, both of those

9  things could cause issues with the drug.  And Mr. Prieto

10  has shown that because it's so significant in the 3-drug

11  protocol, that for the first drug to do what it's supposed

12  to do, that it is to render him unconscious and insensate,

13  that there is a substantial risk.  Drugs that haven't been

14  properly sterility tested can cause some kind of reaction.

15  They may not work.

16       As you mentioned earlier, in Texas this could also be

17  the case.  It's unclear because we have not been able to

18  receive the information about whether any of this batch

19  has been used in any Texas executions.  But what we do

20  know is that it is absolutely clear from all of the

21  evidence we've been able to receive, and heard today, that

22  the Department of Corrections doesn't really understand

23  the precautions that need to be taken with a very fragile

24  substance like compounded pentobarbital.  And they haven't

25  done their investigation.  They haven't looked into this.

1    And that raises serious concerns that there will be a

2  substantial risk of harm to Mr. Prieto with the chemical

3  kept in warm temperatures which could have well degraded

4  well below the 94.6% potency rate, and therefore not be

5  able to operate as it's supposed to render him

6  unconscious.

7    And just to note in terms of that, you know,

8  Mr. Prieto, there was some discussion earlier about

9  execution of remedies.  He has tried multiple times to

10 obtain this information.  The purpose of the exhaustion

11 requirement is that the Department of Corrections would

12 have an opportunity to address the information and the

13 situation before it has to come to a court.  And that is

14 certainly what Mr. Prieto tried to do.

15    He tried to, at the earliest opportunity that he was

16 able to, obtain this information.  He started trying to

17 get more.  Because as we mentioned earlier, we're not

18 saying that the Department of Corrections cannot --

19    THE COURT:  I understand this is an emergency motion.

20    MS. PEIFFER:  Okay.

21    THE COURT:  I certainly understand that.

22    MS. PEIFFER:  Okay.  When then I will forgo anymore

23 discussion of exhaustion.

24    But just to mention briefly the feasible alternative,

25 because that is something that has to be shown in the

1   Eighth Amendment claim.  Mr. Prieto has shown a feasible

2   alternative.  He's not saying that compounded

3   pentobarbital can never be used.  All he's saying is that

4   it has to properly investigated, and that the

5   responsibility of using compounded pentobarbital has to be

6   taken --

7        THE COURT:  What source would you recommend that the

8   Virginia Department of Corrections use for that?  Do you

9   have one available?

10       MS. PEIFFER:  Do I have a source --

11       THE COURT:  Yes.  For the pentobarbital.

12       MS. PEIFFER:  Well, it could be that the source

13  they've already used is acceptable.  We just don't know

14  that without the proper testing and the proper

15  investigation.  And it seems clear from the testimony

16  today that they did not pursue that.

17       There are a number of laboratories making compounded

18  pentobarbital.  And with all due respect, I don't think

19  the standard is that I have to provide a laboratory today

20  that they can turn to.  But we do know that many states

21  use compounded pentobarbital.  They obtained compounded

22  pentobarbital.

23       THE COURT:  Okay.

24       MS. PEIFFER:  But because of the secrecy laws and the

25  fact that we're not allowed to know what laboratories are

1 making the pentobarbital, I can't list off laboratories.

2 But that's certainly one of the factors in understanding

3 the quality and the potency and the stability of the drug.

4 And that's why it's so important to obtain this

5 information instead of blindly trusting that it will do

6 what it's supposed to do.

7       And going back to just the point of -- because I

8 think the point about when you're able to obtain this

9 information also goes to the balance of equity.

10 Mr. Prieto has tried to obtain this information.  He's

11 tried to propose a feasible alternative.  And the

12 information just keeps coming out piecemeal.

13       First, there was this FOIA response.  I have only the

14 photograph of the bottles and one DEA form.  And FOIA

15 requests have been made continuously to the Virginia

16 Department of Corrections.  And the first time any of this

17 information came to light was in September.  And that

18 seemed, based on the requirements of FOIA, that that was

19 all that was out there.

20       Then when Mr. Prieto told counsel for the Virginia

21 Department of Corrections that he was considering filing a

22 law suit because there was no other way to get the

23 information, the Virginia Department of Corrections

24 responded to the letter three hours later, and provided

25 very minimal information that was vague and conclusory.

1 It didn't really do anything other than raise further

2 concerns that the Department of Corrections were not

3 taking their responsibility to investigate this seriously,

4 including misunderstanding -- I think Your Honor mentioned

5 earlier about thinking that compounded pentobarbital is

6 all the same, instead of recognizing that it's very

7 variable, and depends on the way it is made and the way it

8 is stored and what happens to those mixtures.

9      And then it was very surprising after the lawsuit was

10 filed, and the motion to dismiss was filed late yesterday

11 afternoon, and that's the first time that the lab testing

12 came to light.  Until this point, we had no knowledge of

13 what lab testing was done.  And at that point, as I

14 mentioned, the lab testing still doesn't show that the

15 necessary testing has been done to show that this drug can

16 be used, and that it would not cause a substantial risk of

17 serious pain to Mr. Prieto in violation of the Eighth

18 Amendment.

19      Do you have any further questions, Your Honor?

20      THE COURT:  Not right now.  No, ma'am.  Thank you.

21 Very nice job.

22      MR. LEE:  Your Honor, can I make one short comment?

23      THE COURT:  No.  We don't do that.  You know that,

24 Mr. Lee.  You can give the rebuttal argument if you wish.

25 But, no, I'm not going to allow you to alternate final

1  arguments.

2       Ms. O'Shea.

3       MS. O'SHEA:  Yes, Your Honor.

4       Just to correct, or comment, on a couple of things

5  that just came up in closing arguments from Mr. Prieto's

6  counsel.  Virginia's 3-drug protocol, actually, is not

7  unique.  We will not be the first jurisdiction to use

8  compounded pentobarbital as the first substance in a

9  3-drug execution.  So I just wanted to bring that to the

10 Court's attention.

11      THE COURT:  That's fine.  I accept your

12 representation, but I have no evidence of that before me.

13 So I accept your representation for what it's worth, but

14 it doesn't constitute evidence.  So go ahead.

15      MS. O'SHEA:  It does not.

16      Texas does have a different protocol than we do.

17 They use the pentobarbital as their lethal agent.  It is

18 what they administer to kill.  And they have used this in

19 24 executions.  They have been storing it at 60 to

20 80 degrees.  That's the instructions that Texas gave us on

21 how they store their compounded pentobarbital from their

22 pharmacy where they got it from.

23      And they have had no issues with respect to utilizing

24 this particular drug.  The Virginia Department of

25 Corrections was entitled to rely upon representations from

1   Texas officials as to how to store their pentobarbital

2   that they have made and they have been using in executions

3   for the past two years.

4        With regard to the beyond use date that has been

5   bought up, the 1-year date on the bottle, there's no

6   evidence of it one way or the other.  But I would note

7   that a 1-year beyond use date tends to indicate that the

8   substance was actually well sterilized and well preserved,

9   or it wouldn't have been given a date that long.

10       Moreover, their own expert testified that a 1-year

11  date was not out of the realm of possibility.  That he

12  usually saw three to six months, but that up to 1-year was

13  certainly feasible.  So that extended use by date was only

14  a --

15       THE COURT:  He said that was on the outer end of time

16  period of which you can use it.

17       MS. O'SHEA:  On the outer end.  Yes.  But that's

18  still within limits, correct?  Yes.

19       With regard to the legal standing, Your Honor is very

20  familiar with it, so I'm not going to harp on it too much,

21  but --

22       THE COURT:  This is not the first preliminary

23  injunction I've handled.  I assure you.

24       MS. O'SHEA:  I am certain it is not, Your Honor.

25       THE COURT:  Okay.

1      MS. O'SHEA:  *"Sure or very likely to cause serious*

2 *illness or needless suffering."*  There has been no

3 evidence here today.  Nothing alleged other than sheer

4 speculation that if the pentobarbital was not made

5 correctly, if it wasn't stored correctly, if it wasn't

6 brought to Richmond correctly, maybe perhaps it might not

7 render him all the way unconscious.  But even their own

8 expert said, I don't know.  I can't say.  It's sheer

9 speculation at that point.

10      Moreover, Virginia, as Mr. Robinson testified, has

11 precautions built in to its protocol, its lethal injection

12 protocol, that if the inmate has not been rendered

13 unconscious, we'll know about it before we go forward with

14 the execution.  That greatly minimizes any risk of even

15 the slightest amount of pain in the event that perhaps the

16 pentobarbital is not as completely efficacious as

17 Mr. Prieto might like for it to be.

18      The possibilities and speculative scenarios, the

19 parade of horribles that are listed in the plaintiff's

20 pleading, are sufficient -- are just insufficient to rise

21 to the level of an Eighth Amendment violation.

22      With regard to Virginia was entitled to rely upon

23 Texas, there's a presumption of regularity that attaches

24 to officials in the coarse of their official duties.  To

25 the extent that the allegations that Virginia acted

1  unreasonable, I don't think that's borne out by the

2  circumstances at all.

3       Mr. Robinson said, you know, if they had said that

4  they refused to provide us any information, if they had

5  refused to verify that this was what it claims to be, we

6  would not have taken it.  They acted reasonably under all

7  of the circumstances.

8       As Your Honor mentioned before, I don't believe

9  there's been any showing of an available alternative, and

10 so that's the second prong of the *Glossip* test that's not

11 been satisfied under these circumstances either.

12      So, in sum, there's no likelihood of success on the

13 merits here.  Preliminary injunctive relief should not be

14 issued.

15      I'll touch briefly, briefly on the other remaining

16 elements for injunctive relief.  With respect to

17 irreparable harm, this Court stated in *Reid*, there is

18 simply no reason to believe that the speculative list of

19 horribles described by the inmate are likely to come to

20 pass.  The likelihood of the inmate suffering irreparable

21 harm from the manner in which the defendant intends to

22 carry out the sentence is so remote as to be nonexistent.

23      And that is precisely the scenario before the Court

24 today.

25      The balance of the equities, counsel referenced the

1   fact that Mr. Prieto apparently sent a letter.  I don't
2   believe that any of that is in evidence or attached to any
3   of the pleadings.  I'm not familiar with any of that.  The
4   Department of Corrections couldn't give a certificate of
5   analysis that they didn't have.  We have it.
6       The balance of the equities also weigh in favor of
7   denying equitable relief because, as they made a big deal
8   of, a drug's potency is decreased over time.  If we were
9   to delay his execution at this juncture, Virginia's
10  ability to execute this serial murder rapist would
11  diminish.  The balance of the equities tend in favor of
12  proceeding with the execution, particularly in light of
13  the highly speculative nature of the pleadings and the
14  allegations before the Court.
15      Filing a 1983 suit does not entitle you to a stay of
16  your execution.  You are not entitled to a stay just to
17  get discovery in the case.
18      As the Eighth Circuit stated in the *Zink* case, they
19  rejected his argument that I need a stay to find out if
20  more information exists.  The grounds of Eighth Amendment
21  claims should not be permitted to achieve indirectly a
22  defacto injunction against a lawful method of execution.
23  That's precisely what we have here.
24      Finally, there is a public interest here in finally
25  bringing closure to the many victims of Mr. Prieto.

1     A quote from the *Thompson* case, 523 U.S. 538. *"When*

2  *lengthy federal proceedings have run their course and a*

3  *mandate denying relief has issued, finality acquires an*

4  *added moral dimension.  Only with an assurance of real*

5  *finality can the State execute its moral judgment in a*

6  *case.  Only with real finality can the victims of crime*

7  *move forward knowing the moral judgment will be carried*

8  *out."*

9     To unsettle these expectations is to inflict, to

10 inflict, a profound injury to the powerful, a legitimate

11 interest in punishing the guilty, an interest shared by

12 the state and victims of crimes alike.

13    It has been 27 years since the bodies of two 22-year

14 old children, children basically, graduate students, were

15 found in that cold field in Fairfax.  Twenty-seven years

16 since the family and acquaintances of Warren Fulton and

17 Rachael Ranever, some of whom are in the courtroom today,

18 27 years since they were told that Rachael had been shot

19 and raped as she lay dying.  Twenty-seven years since

20 Warren was shot in the back.

21    It is time for this to stop now.  It is time for the

22 carousel to end.  It is time for justice to be brought for

23 them.  It is time to end all of this, and let Mr. Prieto's

24 execution proceed and commence.

25    I ask the Court to vacate the TRO, and to dismiss the

1  preliminary injunction.

2       THE COURT:  Ms. O'Shea, thank you very much.

3       Mr. Lee, I'll give you the final word, sir.

4       MR. LEE:  I believe the evidence presented shows that

5  there was no sterility testing done on these drugs.  It

6  also shows that the drugs were kept at room temperature

7  apparently before they were received, as Ms. O'Shea just

8  said, during transport, and since.  And the science shows

9  that compounded pentobarbital kept at room temperature has

10 a beyond use date of 24 hours.  The drugs were

11 manufactured -- excuse me, prepared in April of 2015.  I

12 believe the evidence conclusively shows that these drugs

13 are not scientifically usable -- or science shows that

14 they should not be used.

15      THE COURT:  Mr. Lee, I wasn't going to bring this up

16 until you teed the point up.  One thing that was

17 conspicuously absent in your evidence -- and I thought

18 Dr. Ruble was a very impressive pharmacologist.  No

19 question about it.  But when you asked him questions about

20 whether or not these standards apply to an execution, he

21 dodged the questions.  He never once said that he had any

22 experience whatever, and there's not a shred of evidence

23 that the same standards would apply in an execution

24 setting.  And when the question was asked of him, he very

25 gingerly dodged it.

1    MR. LEE:  Well, Your Honor, I'll just say that the

2  very drugs they have that they obtained have a beyond use

3  date on them.  Published on them.  And the beyond use

4  date --

5    THE COURT:  April 14, 2016.  What's today?  Today is

6  October 1, 2015.

7    MR. LEE:  Yeah.  Exactly, Your Honor.

8    But if you look -- I encourage you to look at The

9  United States Pharmacopeia.  That's the science of the

10  drugs.  And the drugs that are going to be used, are going

11  to be used far outside anything that science will allow.

12    THE COURT:  All right, sir.  Thank you very much.

13    All right.  I appreciate this very much.  Counsel did

14  a superb job in the time frame you had here.  I appreciate

15  it very much.

16    I will stand in recess at this point.  An opinion

17  will be issued today.

18    MR. LEE:  Thank you, Your Honor.

19    (The proceeding concluded at 3:12 p.m.)
             REPORTER'S CERTIFICATE
20      I, Krista Liscio Harding, OCR, RMR,
   Notary Public in and for the Commonwealth of
21  Virginia at large, and whose commission expires
   March 31, 2016, Notary Registration Number 149462,
22  do hereby certify that the pages contained herein
   accurately reflect the notes taken by me, to the
23  best of my ability, in the above-styled action.
         Given under my hand this 13th day of November, 2015.
24                  _____

                      Krista Liscio Harding, RMR
25                    Official Court Reporter